GEORGE SHEGOG, EXECUTOR (ESTATE OF DONALD PEREYRA), ET AL. *v.* GEORGE ZABRECKY ET AL. (12675)

DUPONT, C. J., and FOTI and SCHALLER, Js.

Argued November 2, 1994—decision released February 7, 1995

*Brendan T. Flynn,* with whom, on the brief, was *Robert L. Hirtle,* for the appellants-appellees (defendants).

*Norman J. Voog,* with whom, on the brief, was *Christopher J. Molyneaux,* for the appellees-appellants (plaintiffs).

DUPONT, C. J. The defendants, George Zabrecky and his chiropractic practice, the Life Extension Center, appeal from a judgment rendered in accordance with jury verdicts for the plaintiffs, George Shegog, executor of Donald Pereyra's estate, and Barbara Pereyra, the decedent's widow. The plaintiffs sought damages for wrongful death caused by the negligence of the defendants, and for loss of consortium, respectively.

The defendants claim that (1) the plaintiffs did not present sufficient expert testimony to prove that the defendants' actions were the proximate cause of the death of Donald Pereyra and (2) the jury's award for loss of consortium was excessive. The plaintiffs have filed a cross appeal, claiming that the trial court should have allowed the plaintiffs to prove proximate cause with medical reports of the decedent's treating physicians, as well as through expert testimony. We affirm the plaintiffs' judgment in the defendants' appeal and dismiss the plaintiffs' cross appeal.

Barbara Pereyra and Donald Pereyra were married in January, 1987. Donald Pereyra first sought treatment for back pain from Zabrecky at the Life Extension Center in May, 1987. At that time, Zabrecky ordered X rays of Pereyra's spine. The X rays revealed that Pereyra was suffering from a fractured vertebra caused by a malignant tumor. Zabrecky immediately referred Pereyra to a surgeon in New York who, in June and July of 1987, performed two operations to stabilize Pereyra's spine and remove the tumor. Following the surgery, Pereyra began a course of radiation treatments from radiologist Craig Usas. A CAT scan revealed that the cancer had spread to Pereyra's lungs. Usas and other physicians consulted by Pereyra recommended that chemotherapy be considered once the radiation therapy had concluded, and advised Pereyra that given the form of cancer from which he

suffered, his chances of survival with chemotherapy were 50 percent or better.

During the summer of 1987, Pereyra continued to consult with a number of physicians regarding the treatment of his cancer. He also continued to see Zabrecky throughout the summer and fall of 1987. Pereyra and Zabrecky discussed treatment options, and Zabrecky recommended that Pereyra forgo the chemotherapy.[1] Zabrecky recommended that Pereyra instead follow a course of treatment with two protein compounds manufactured in Germany, neytumorin and neythymin. The primary ingredient in both substances is animal protein. Neither drug is approved by the federal Food and Drug Administration (FDA), and chiropractors are prohibited by law from prescribing drugs. Nonetheless, Zabrecky prepared a treatment schedule for Pereyra that progressed from oral administration of neytumorin to injections of neythymin. Zabrecky provided Pereyra with an initial supply of the protein compounds along with instructions as to how to inject them, and arranged for further supplies of the compounds to be delivered directly to Pereyra's home. Pereyra took the neytumorin orally and then by injection until November, 1987, when he switched to injections of neythymin.[2]

The cancer continued to spread throughout Pereyra's ribs, spine, right femur, clavicle, and sacrum. In early November, after additional cancer was discovered, radi-

---

[1] The plaintiff Barbara Pereyra testified that her husband had great confidence in Zabrecky, more so than in the physicians who were treating him, because it was Zabrecky who initially had discovered the tumor in his back. Since Pereyra died while undergoing radiation treatments, before receiving chemotherapy, we do not know for certain, if, as Barbara Pereyra testified, he would have followed Zabrecky's advice and forgone the chemotherapy.

[2] Barbara Pereyra testified that her husband, at Zabrecky's direction, began to take neytumorin orally in July, began to inject neytumorin in August or September, and began to inject neythymin in November.

ation treatments were given daily. Pereyra's health began to deteriorate visibly at approximately the same time. The radiation treatments themselves left his skin red and tender. Pereyra's condition worsened between Thanksgiving and December 8, 1987, when Usas admitted him to the hospital because of jaundice-like symptoms. His physicians determined that the cancer had not yet spread to his liver and that something else was causing the symptoms. Pereyra then admitted to his physicians for the first time, after considerable pressure from his wife, that he had been injecting himself with the German protein compounds provided by Zabrecky. Barbara Pereyra testified that Zabrecky had specifically instructed Pereyra not to tell his treating physicians that he was injecting the protein compounds.

Pereyra died on December 17, 1987, approximately six weeks after he had begun the injections of neythymin and approximately five months after he first took neytumorin orally. An autopsy revealed that he died of necrosis of the liver caused by a toxic reaction to a foreign substance. Zabrecky had performed an initial liver enzyme study on Pereyra prior to giving him the protein compounds, but did not perform further tests after the protein compound treatment began. The only drugs or medicine used by Pereyra between July, 1987, and his death were the protein compounds prescribed by Zabrecky.

The plaintiffs filed a lawsuit against the defendants in March, 1990, in five counts, seeking damages for negligent treatment and care. They alleged a breach of the standard of care and treatment owed to Pereyra. The negligence alleged was the administering of drugs when statutorily prohibited, withholding of that fact from the treating physicians, the failure to diligently "follow" the decedent's chemical blood work, advising the decedent to use drugs that had "expired," administering therapy not approved by the FDA, engaging

in the unlicensed practice of medicine, and inducing the decedent to forgo appropriate therapy.

At trial, the plaintiffs were allowed to introduce into evidence reports from three of Pereyra's treating physicians, Robert Schneider, an oncologist, and Lawrence Alpert and Hans Popper, pathologists. The transcripts supplied by the parties do not include either the offers into evidence of these reports or the trial court's charge to the jury as to how to consider these reports. We presume that they were offered and admitted under General Statutes § 52-174 (b).[3] The reports indicate that the treating physicians were all of the opinion that Pereyra died of liver failure and not cancer. None of the doctors examined the protein compounds to see if they were capable of causing injury to the liver. There was no analysis of Pereyra's liver tissue to see what substances had caused the fatal damage, but the liver was analyzed for evidence of cancerous tissue, and none was found.

The plaintiffs also presented the report of an expert witness, Zalmen Arlin, who had been disclosed by the plaintiffs as an expert witness but had died prior to trial. His preliminary report was admitted into evidence, over the defendants' objection,[4] pursuant to Gen-

---

[3] General Statutes § 52-174 (b) provides in pertinent part: "In all actions for the recovery of damages for personal injuries or death . . . any party offering in evidence a signed report and bill for treatment of any treating physician, dentist, chiropractor, osteopath, natureopath or podiatrist may have the report and bill admitted into evidence as a business entry . . . . The use of any such report or bill in lieu of the testimony of such treating physician, dentist, chiropractor, osteopath, natureopath or podiatrist shall not give rise to any adverse inference concerning the testimony or lack of testimony of such treating physician, dentist, chiropractor, osteopath, natureopath or podiatrist."

[4] Prior to trial, the defendants filed an objection to the plaintiffs' request to allow the report into evidence on the ground that the report was not the record of a treating physician, but was a letter expressing professional opinions and relying on the report of another physician, Eric Moskow, and therefore hearsay. The court ruled the report admissible but ordered the references to Moskow's report deleted.

eral Statutes § 52-174 (a).[5] Arlin had reviewed Pereyra's medical records and autopsy reports and agreed with the diagnosis of liver failure. He related in his report that he had no information on the German protein compounds and was in the process of securing a translation of a German textbook that discussed them. He concluded that he assumed the German drugs to be toxic unless the contrary were shown to be true.

The defendants moved to dismiss at the close of the plaintiffs' case for their failure to establish a prima facie case of proximate cause. The motion was denied, and the defendants proceeded with their case.

The defendants called as their expert witness James Bidanset, a forensic toxicologist. Bidanset was the only witness who had analyzed the German drugs,[6] and he testified that they were incapable of causing Pereyra's

---

[5] General Statutes § 52-174 (a) provides: "In all actions for the recovery of damages for personal injuries or death, (1) if a physician, dentist, chiropractor, osteopath, natureopath, podiatrist, professional engineer or land surveyor has died prior to the trial of the action, or (2) if a physician, dentist, chiropractor, osteopath, natureopath, podiatrist, professional engineer or land surveyor is physically or mentally disabled at the time of the trial of the action to such an extent that he is no longer actively engaged in the practice of his profession, the party desiring to offer into evidence the written records and reports of the physician, dentist, chiropractor, natureopath, osteopath, or podiatrist concerning the patient who suffered the injuries or death and the reports and scale drawings of the professional engineer or land surveyor concerning matter relevant to the circumstances under which the injuries or death was sustained shall apply to the court in which the action is pending for permission to introduce the evidence. Notice of the application shall be served on the adverse party in the same manner as any other pleading. The court to which the application is made shall determine whether the person is disabled to the extent that he cannot testify in person to the action. Upon the court finding that the person is so disabled, the matters shall be admissible in evidence as a business entry in accordance with the provisions of § 52-180 when offered by any party in the trial of the action."

[6] The samples tested were not taken from the actual drugs used by Pereyra.

liver failure. The tests he performed were to determine whether the protein compounds were poisonous to the human body. The test results showed that they were not. Bidanset noted that the autopsy report did not contain a toxicology report, although such tests are usually performed. He also testified that the expiration date of the compounds had passed at the time Pereyra injected them, which could mean that the drugs had become less potent, and that it was standard medical procedure to monitor liver enzymes when injecting a patient with protein substances. He also testified, however, that necrosis of the liver can be caused by the injection of foreign protein substances, and that the normal reaction time of the human liver to a foreign protein is, on average, six weeks.

The jury awarded the plaintiff executor $20,000 for economic damages, which included medical bills and related expenses and lost earnings, and $150,000 for noneconomic damages, which included permanent disability, pain and suffering, and loss of enjoyment of life's activities, and awarded the plaintiff wife economic damages of $500 and noneconomic damages of $150,000 for loss of consortium.

The defendants filed a motion to set aside the verdict, which was denied.[7] The defendants also filed a motion for remittitur, claiming that the noneconomic damages awarded for loss of consortium were excessive. That motion was also denied.

Our standard of review differs for the defendants' two claims. With regard to whether the plaintiff executor had proved proximate cause for his negligence

---

[7] The defendants argued that the verdict was (1) contrary to law in that the plaintiffs had not proved proximate cause, (2) against the evidence in that the plaintiffs' expert opinion evidence was legally insufficient, (3) excessive as to the noneconomic damages awarded to the plaintiff wife for loss of consortium, and (4) improper because the court commented on the defendants' jury form.

action, the "trial court's refusal to set aside the verdict is entitled to great weight in our assessment of the claim that its decision is erroneous." *Norrie* v. *Heil Co.*, 203 Conn. 594, 606, 525 A.2d 1332 (1987). "Our role in addressing this claim is extremely limited." Id. The defendants' claim that the amount of the verdict is excessive, however, raises a question of law and not of fact, and, therefore, the trial court's denial of the motion for remittitur is subject to our plenary review. *Vandersluis* v. *Weil*, 176 Conn. 353, 358, 407 A.2d 982 (1978); *Preston* v. *Phelps Dodge Copper Products Co.*, 35 Conn. App. 850, 855–56, 647 A.2d 364 (1994).

I

## PROXIMATE CAUSE

We first address the defendants' claim that the plaintiffs failed to establish proximate cause. In every professional malpractice action, the plaintiff is required to prove that (1) the defendant was obligated to conform to a recognized standard of care, (2) the defendant deviated from that standard, (3) the plaintiff suffered some injury, and (4) the defendant's act in departing from the standard of care caused the plaintiff's injury. *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 334–42, 430 A.2d 1 (1980); *LaBieniec* v. *Baker*, 11 Conn. App. 199, 202–203, 526 A.2d 1341 (1987). In the present case, prior to trial, the Connecticut board of chiropractic examiners found that Zabrecky had violated a recognized standard of care in prescribing the German protein compounds to Pereyra and accordingly suspended his license.[8] Thus, the first two requirements were satis-

---

[8] In November, 1990, Zabrecky was brought before the Connecticut board of chiropractic examiners to answer charges arising out of his treatment of Pereyra. After a hearing, the board found that Zabrecky had exceeded the scope of chiropractic practice and had rendered improper and incompetent care in prescribing the German protein compounds to Pereyra, in developing a course of treatment using the compounds, and in showing Pereyra how to inject them.

fied. The third requirement, evidence of an injury, is met by Pereyra's death. The defendants concede that the first three requirements for medical malpractice existed. The only element in dispute at trial was causation. No matter how negligent a party may have been, if his negligent act bears no relation to the injury, it is not actionable. *LaBieniec* v. *Baker*, supra, 206.

In order for legal causation to exist, both actual cause and proximate cause must be present. *Coste* v. *Riverside Motors, Inc.*, 24 Conn. App. 109, 113, 585 A.2d 1263 (1991). Actual cause requires evidence that the plaintiff's injury would not have occurred in the precise way that it did without the defendant's conduct. Id. Proximate cause is defined as an actual cause that is a substantial factor in the resulting harm. *Doe* v. *Manheimer*, 212 Conn. 748, 757, 563 A.2d 699 (1989). The "test" for proximate cause is whether the defendant's conduct was a "substantial factor" in producing the plaintiff's injury. Id., 758. This substantial factor test reflects the inquiry fundamental to all proximate cause questions, namely, "whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence. . . ." (Citations omitted; internal quotation marks omitted.) Id. The issue of proximate cause is ordinarily a question of fact for the trier of fact and becomes a question of law only when " 'the mind of a fair and reasonable person could reach only one conclusion . . . .' " *Coste* v. *Riverside Motors, Inc.*, supra, 114. Here, the defendants argue that the plaintiffs did not introduce sufficient evidence to allow the jury to find proximate cause because they did not present sufficient expert opinion evidence to show that the defendants' actions were the proximate cause of Pereyra's injuries.

Expert medical opinion evidence is usually required to show the cause of an injury or disease because the

medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person. *Aspiazu* v. *Orgera,* 205 Conn. 623, 631, 535 A.2d 338 (1987); *Collette* v. *Collette,* 177 Conn. 465, 471, 418 A.2d 891 (1979). Expert medical opinion evidence is generally required in all cases involving professional competence and malpractice. *Grody* v. *Tulin,* 170 Conn. 443, 449, 365 A.2d 1076 (1976); *Campbell* v. *Pommier,* 5 Conn. App. 29, 32, 496 A.2d 975 (1985). Where expert medical opinion evidence is required in a medical malpractice case, "[t]he causal relation between an injury and its later physical effects may be established by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question." *Boland* v. *Vanderbilt,* 140 Conn. 520, 525, 102 A.2d 362 (1953). The expert opinion cannot rest on surmise or conjecture because the trier of fact must determine probable cause, not possible cause. *Aspiazu* v. *Orgera,* supra, 632; *Hammer* v. *Mount Sinai Hospital,* 25 Conn. App. 702, 718, 596 A.2d 1318, cert. denied, 220 Conn. 933, 599 A.2d 384 (1991). In other words, the expert opinion must be based on reasonable probabilities. *Struckman* v. *Burns,* 205 Conn. 542, 555, 534 A.2d 888 (1987). An expert, however, need not use "talismanic words" to show reasonable probability. *Aspiazu* v. *Orgera,* supra, 632. In other words, formulaic words are not essential when an expert renders an opinion as long as it is clear that the opinion of the expert is expressed in terms of probabilities. *Struckman* v. *Burns,* supra, 555.

An exception to the general rule with regard to expert medical opinion evidence is when the medical condition is obvious or common in everyday life. *State* v. *Orsini,* 155 Conn. 367, 372, 232 A.2d 907 (1967); see also *Parker* v. *Supermarkets General Corp.,* 36 Conn.

App. 647, 652 A.2d 1047 (1995). Similarly, expert opinion may not be necessary as to causation of an injury or illness if the plaintiff's evidence creates a probability so strong that a lay jury can form a reasonable belief. *Gannon* v. *Kresge Co.*, 114 Conn. 36, 38, 157 A. 541 (1931). Expert opinion may also be excused in those cases where the professional negligence is so gross as to be clear even to a lay person. *Puro* v. *Henry*, 188 Conn. 301, 305, 449 A.2d 176 (1982); *Slimak* v. *Foster*, 106 Conn. 366, 370, 138 A. 153 (1927).

The defendants claim that Arlin's report and the reports of the treating physicians were insufficient expert opinion because the physicians assumed, without any toxicological analyses having been performed, that the German protein compounds caused the death of Pereyra, and did not rule out other possible causes of liver failure. The defendants claim that absent such tests, the reports are mere conjecture and speculation, lacking foundation and therefore insufficient to establish proximate cause. The defendants on appeal do not claim error because the court admitted the reports as expert medical opinion or because the jury should not have considered the cumulative effect of all of the reports together to establish causation. Rather, they claim that the reports, even when considered together, are insufficient to show causation because the protein compounds were not analyzed to determine if they were capable of causing injury to the liver and because Pereyra's liver tissue was not analyzed to determine whether the protein compounds caused the necrosis. The defendants, therefore, argue that the jury's finding that Zabrecky's negligence proximately caused Pereyra's death is unreasonable.

The defendants also argue that this case does not fall within the narrow exception to the rule requiring expert medical evidence in medical malpractice cases because chemical toxicity and the origins of liver failure are not

within a lay person's ordinary knowledge. The defendants conclude that since the only toxicological tests introduced into evidence, those performed by Bidanset, showed that the German drugs were nontoxic, the jury could not have reasonably found that the defendants caused Pereyra's injuries.

The plaintiffs, on the other hand, argue that Arlin's report, together with the reports of the treating physicians, provided sufficient evidence from which the jury reasonably could have found proximate cause. We agree with the plaintiffs.

We conclude that the contents of the reports, together with the inferences drawn most favorably to the plaintiffs from the other evidence, created such a strong probability that Pereyra's death was caused by the negligent administration of the German drugs that the jury could have reasonably found that Zabrecky's negligence proximately caused Pereyra's death. See *Puro* v. *Henry*, supra, 188 Conn. 308.

One of the ways to establish the causal relationship between particular conduct of a defendant and a plaintiff's injury is the expert's deduction, by the process of eliminating causes other than the conduct, that the conduct was the cause of the injury. *Boland* v. *Vanderbilt*, supra, 140 Conn. 525. The submitted reports indicate that each physician deduced that the German drugs were the most probable cause of Pereyra's liver failure, even without analysis of the drugs.

Arlin's report contained the following conclusions: "This patient was eligible for therapy which has a high response rate . . . . [H]owever, because of the encouragement of Zabrecky to stay away from this treatment, he undertook a course of action and treatment with drugs that have no known utility in this country . . . . [W]ithin a short period, less than two months of starting with these therapies, the patient

developed severe hepatic failure that ultimately led to his death . . . . [T]here was no evidence of hepatic mestases . . . . One must therefore assume, that some other material that the patient was exposed to was or could have induced the liver disease . . . . The only known treatment which he received was the material imported from Germany . . . . [Pereyra's] disease probably could have been controlled ha[d] he not taken the injections administered by Dr. Zabrecky."

Schneider, one of the oncologists who treated Pereyra at the hospital, indicated in his report that he found "no evidence of mestases in the liver. The patient ultimately succumbed, died of liver failure. Autopsy revealed necrosis of the liver suggestive of possible drug toxicity and further history obtained after the patient died showed that he had been taking injections of a German made compound which was intended as some form of anti-cancer agent as well as taking this agent orally. This incident was reported to the [FDA] . . . . The patient [h]as taken this so called medication . . . as far as we could tell not under the supervision of any physician and was certainly unknown to any of us. Therefore the cause of death was most likely the self-administration of so-called anti-tumor agent."

Alpert, the pathologist who performed the autopsy, concluded that Pereyra's death was caused by "toxic centrolobular cholestatic injury to liver cells with hepatic failure, probably secondary to toxic reaction to IV anti-tumor preparation." Popper, another pathologist who reviewed Alpert's report, agreed with this diagnosis, concluding that Pereyra died of "toxic cholestatic liver injury which is probably an effect of the German anti-cancer agent."

Finally, even the defendants' expert witness, Bidanset, a forensic toxicologist, testified that Zabrecky, according to standard medical procedure, should have

been monitoring Pereyra's liver enzymes once the protein compound therapy had begun. He also admitted that necrosis of the liver can be caused by the injection of foreign protein substances, and that, on average, the reaction time of the human liver to such foreign substances is six weeks. This testimony bolsters rather than discredits the plaintiffs' medical reports because the only foreign substances taken by Pereyra were the German protein compounds, and because Pereyra died of liver failure almost exactly six weeks after he began injecting the compounds.

Furthermore, we disagree with the defendants' claim that each of the reports submitted into evidence by the plaintiffs lacks foundation. As discussed previously, an expert opinion need not be phrased in "talismanic words" to show reasonable probability. *Aspiazu* v. *Orgera*, supra, 205 Conn. 632. Each of the reports indicates that the physician submitting the report concluded that the most probable cause of Pereyra's death was the German protein compounds. We therefore hold that each report contains an opinion based on reasonable probabilities, and therefore constitutes sufficient expert testimony.

General Statutes § 52-174 (b) provides that a signed report of a treating physician may be used in lieu of the testimony of that treating physician. This is a case, however, where Zabrecky's actions so clearly constituted gross professional negligence that, even if we did not consider the medical reports of Pereyra's treating physicians as expert medical opinion testimony, the jury could have nonetheless reasonably found that Zabrecky's negligent actions were the proximate cause of Pereyra's death. While ordinarily a plaintiff cannot prevail unless there is positive evidence of an expert nature from which the jury could reasonably conclude that the defendant was negligent, and that the negligence was the proximate cause of the plaintiff's injury,

there is an exception where, as here, "there is manifest such gross want of care or skill as to afford, of itself, an almost conclusive inference of negligence that the testimony of an expert is not necessary." *Puro* v. *Henry*, supra, 188 Conn. 305.

The type of breach of the standard of care has an impact on the plaintiff's burden of proving proximate cause, because each inferential fact need not be proven by the quantum of proof required to find the ultimate fact. See id., 310. The reports and Zabrecky's grossly negligent actions, together with the circumstantial evidence introduced, prove proximate cause by a fair preponderance of the evidence. See id.

## II

### LOSS OF CONSORTIUM

Loss of consortium is defined as the loss of services, financial support, and the variety of intangible relations that exist between spouses living together in marriage. *Gurliacci* v. *Mayer*, 218 Conn. 531, 562, 590 A.2d 914 (1991). The "intangible" components of consortium are the "constellation of companionship, dependence, reliance, affection, sharing and aid which are legally recognizable, protected rights arising out of the civil contract of marriage." (Internal quotation marks omitted.) Id. Damages awarded for loss of consortium include future as well as past suffering, and are measured by the extent of the loss incurred, to the extent that money can measure it. *Keyes* v. *Churchward*, 135 Conn. 115, 118, 61 A.2d 668 (1948). Since loss of consortium is incapable of precise measurement, considerable latitude is allowed a jury in estimating damages. Id.

The defendants argue that the amount of noneconomic damages awarded to Barbara Pereyra for her loss of consortium was excessive because the Pereyras were married for less than one year, and also because

by the fall of 1987, Pereyra had become so ill that even without liver failure, he would have lived only another two or three months. The defendants claim that under the circumstances of this case, the award is disproportionate to the injury, particularly because the same amount was awarded to the estate for noneconomic damages for loss of life's enjoyments.

Where, as here, the trial court has denied a motion to set aside a verdict as excessive, we conduct a plenary review to determine whether the verdict shocks the sense of justice or is entirely disproportionate to the injury. *Samose* v. *Hammer-Passero Norwalk Chiropractic Group, P.C.*, 24 Conn. App. 99, 108, 586 A.2d 614, cert. denied, 218 Conn. 903, 588 A.2d 1079 (1991). The "ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption. . . ." (Citation omitted; internal quotation marks omitted.) *Champagne* v. *Raybestos-Manhattan*, 212 Conn. 509, 556–57, 562 A.2d 1100 (1989).

There is ample evidence in the record, particularly in the transcript of Barbara Pereyra's testimony, to support the jury's verdict. While the amount of damages awarded is generous, it cannot be characterized as unjust. Moreover, the amount of a damage award is a matter particularly within the province of the jury, and the assessment of damages always defies any precise mathematical computation. *Hammer* v. *Mount Sinai Hospital*, supra, 25 Conn. App. 724; *Zarelli* v. *Barnum Festival Society, Inc.*, 6 Conn. App. 322, 326, 505 A.2d 25, cert. denied, 200 Conn. 801, 509 A.2d 516 (1986). The trial court, not this court, had the opportunity to gauge the tenor of the trial and detect any factors that could have improperly influenced the jury.

*Donahue* v. *State,* 27 Conn. App. 135, 140, 604 A.2d 1331 (1992). We see nothing in the record that would indicate that the trial court abused its discretion in denying the defendants' motion for remittitur, and, accordingly, we will not disturb that ruling.

### III

### THE CROSS APPEAL

Practice Book § 4005 requires that a cross appellant be aggrieved by the judgment or decision appealed from. The plaintiffs have not shown how they were aggrieved, particularly since they prevailed at trial, by what they characterize as the trial court's restrictive definition of "expert testimony." At oral argument, the plaintiffs argued that the issue of whether the reports of the decedent's treating physicians were the equivalent of expert medical opinion testimony could arise if this case was to be remanded for a new trial.

Practice Book § 4013 (a) (1) (B) is the proper vehicle to "present for review adverse rulings or decisions of the court which should be considered on appeal in the event the appellant is awarded a new trial" rather than a cross appeal. We do not reach the issue because we affirm the trial court's judgment.

The judgment is affirmed.

In this opinion the other judges concurred.