[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff has brought an action against the defendant podiatrist, sounding in professional negligence. Through the amended complaint dated December 15, 1999, the plaintiff alleged, inter alia, that the defendant performed two surgical procedures upon her, and that he provided negligent care as follows: by neglecting to cleanse and render aseptic the plaintiffs wound and injury and permitting the same to fester, become CT Page 7814 sore and develop pus; by performing successive elective surgical procedures on the same toe prior to the expiration of appropriate healing time between surgeries; and by failing to adequately and rapidly recognize, diagnose or treat the plaintiffs infection.[1] The plaintiff further alleged that the defendant's negligence caused her to suffer physical injuries by way of pain, additional surgeries, amputation of the majority of her left fifth toe, and chronic neuritis; pain and mental anguish; financial loss by way of bills incurred for health care services, and diminution of wages and earning capacity; and impairment of her enjoyment of life. Through his answer to the amended complaint, dated January 12, 2000, the defendant denied the allegations of negligence stated by the plaintiff and denied each specified allegation of damages. No special defense of comparative negligence was filed. See Practice Book § 10-53. However, the defendant has claimed that the plaintiffs failure to mitigate her damages caused and!or contributed to the injuries and losses she has suffered, and he further argued that a third party is responsible for the plaintiffs injuries and losses.
This matter was tried to the court, with witness testimony, documentary evidence and argument presented on March 17, 20, 21, 22, and 30, 2000. The parties submitted oral argument on March 31, 2000; post-trial briefs on specified issues were submitted by April 7, 2000. Both parties were represented at trial by skilled and experienced counsel. Documentary and tangible evidence was submitted to the court in addition to testimony from lay and expert witnesses. After hearing and consideration of this matter, for the reasons set forth below, the court finds the issues in favor of the plaintiff, and awards a fair and just amount of economic and non-economic damages as set forth herein.
In evaluating the evidence presented, the court followed the applicable rules for assessing witness testimony. "The question of the credibility of witnesses is for the trier to determine Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force of the evidence is for the trier to determine." (Internal quotation marks omitted.) State v. Santiago, 245 Conn. 301, 318, 715 A.2d 1
(1998); see also State v. Vargas, 34 Conn. App. 492, 498, 642 A.2d 47, cert. denied, 230 Conn. 907, 644 A.2d 921 (1994). The trier of fact may accept or reject, in whole or in part, the testimony of any witness. SeeSmith v. Smith, 183 Conn. 121, 123, 438 A.2d 842 (1981); see also Statev. Vargas, supra, 34 Conn. App. 498; Connecticut Civil Jury Instructions, Credibility of Witnesses § 1.39. "[N]othing in our law is more elementary, than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony." (Internal quotation marks omitted.) Smith v. Smith, supra,183 Conn. 123. In addition, the court heeded the axiom that "[i]t is within the province of the [trier of fact] to draw reasonable and logical CT Page 7815 inferences from the facts proven. . . . The [trier of fact] may draw reasonable inferences based on other inferences drawn from the evidence presented." (External citations omitted.) Scheirer v. Frenish, Inc.,56 Conn. App. 228, 234, ___ A.2d ___ (1999). See alsoState v. Reed, 55 Conn. App. 170, 173, ___ A.2d ___ (1999) ("the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence").
 I FACTS
From the testimony and evidence presented at trial, the court finds that the plaintiff has proved the following facts by a preponderance of the evidence:
On June 19, 1995, the plaintiff, Lucille Reynolds, was a forty-two year old married female, working as an executive in real estate management. The defendant was a health care professional licensed to practice general podiatric medicine and surgery in the state of Connecticut. Prior to that date, at an appointment with the defendant, the plaintiff explained that her fifth toes hurt her when she wore certain shoes. The defendant examined the plaintiff, agreed to provide her with podiatric care, and diagnosed two conditions existing in the fifth toe on her left foot[2]
a bone spur and a hammer toe. There was insufficient evidence from which this court could conclude that these conditions, while painful or irritating, caused any distinct limiting effect upon the plaintiffs other usual activities, which then included her duties of site inspection at work and daily physical exercise such as high-impact aerobics, energetic walking outdoors or on a treadmill.
On June 19, 1995, the defendant performed a consensual and elective surgical procedure at his office, known as hemiphalangectomy, to remove the plaintiffs bone spur. This procedure involved making an incision in the end of the toe, inserting a burr-like instrument, grinding down the bone where the spur was located, and using a stitch to close the incision. Thereafter, the defendant dressed the toe, and discharged the plaintiff with instructions which included a direction to stay off her feet for three to seven days. The defendant also provided the plaintiff with a prescriptions for Tylox, to be used for pain control following surgery.
The plaintiff was seen at the defendant's office on June 27, 1995, approximately eight days later. The plaintiff stated that she had been on her foot all week, and reported pain in the foot. In an effort to ward CT Page 7816 off the development of an infection, the defendant provided the plaintiff with a prescription for an antibiotic; she promptly filled this prescription and took the medication as ordered. The plaintiff also received a new prescription for Tylox, which she filled and used as needed.
The plaintiff was next seen at the defendant's office on July 8, 1995, approximately 11 days after her last appointment. On this occasion, she complained of a cracking sensation when stepping on her toe, and pain when walking. The defendant advised the plaintiff of the possibility that a fracture had occurred in the toe. However, no x-ray images of the toe were obtained until the plaintiffs next visit to the defendant's office, on July 14, 1995.
On July 21, 1995, the defendant performed a second consensual and elective office surgery upon the plaintiff, re-entering the fifth toe to perform an operation for repair of her hammertoe and removing bone fragments from the toe. Prior to and at the time this surgery was performed, the plaintiff had not healed fully from the July 19, 1995 operative procedure. The plaintiff was not advised or aware that a second surgery at this time could increase the risk of infection in the toe. Following the surgery on July 21, 1995, the defendant commenced prescribing significant amounts of Tylox for the plaintiff to use as pain medication.
On August 5, 1995, the patient was seen at the defendant's office upon her report that blood and pus had been coming out of the fifth toe, indicating the apparent presence of infection in the toe tissues. The defendant did not recognize any sign of bone infection, but directed the plaintiff to start taking a different pain medication, Vicodin. No antibiotics were prescribed or offered to the plaintiff on that date, nor were any other measures instituted to effectively address the infection.
The plaintiff was again examined by the defendant at his office on August 8, 1995. On that occasion, he provided a prescription for Keflex, an antibiotic to be taken four times a day, explaining to the plaintiff that this was a precautionary measure. The prescription, filled at CVS pharmacy as Rx # 777087102,[3] also indicated the defendant's intention that a refill be made available to the patient. The patient promptly obtained the Keflex on August 8, 1995, and commenced the antibiotic therapy as prescribed. At this visit, the defendant did not inform the plaintiff that on infection was present in the toe structures.
On August 12, 1995, the plaintiff telephoned the defendant and advised him that, among other things, her toe was draining; that it had a large white blister was forming around the toe; that the toe was slightly CT Page 7817 swollen; and that the incision was opening up. The defendant elected to respond to personal matters, rather than attending to the plaintiff on that date: he told the patient to come into his office for evaluation several days later, on August 15, 1995. The defendant also directed the plaintiff to obtain some exudates from the toe using a swab he had previously provided to her, and recommended that she send the drainage specimen to him at his office by express mail.
Since the plaintiff was informed that the defendant was unavailable to see her on August 12th, she attempted to obtain assistance from a walk-in type medical center located in Framingham, Massachusetts. That center was closed by the time she arrived, so the plaintiff returned on the following day, August 13, 1995. At the Walk-In Medical Care Office, Inc. (Walk-In Office) on that date, the toe wound was cleaned and debrided.
While the plaintiff did not visit the defendant's office on August 15, 1995, she did speak to him by telephone. She reported having a fever and that steristrip closures had been applied at the Walk-In Office over the weekend. The defendant told the plaintiff to come to the office the next day, August 16, 1995. In addition, the defendant provided two prescriptions for the plaintiff on August 15, 1995: one for Vicodin and one for Cipro, another antibiotic.
Thereafter, on August 16, 1995, the plaintiff received treatment from another podiatrist, Larry Suecof. Upon examination, Suecof found that the fifth toe was infected and gangrenous; that the plaintiff suffered from osteomyelitis and cellulitis in the region of the toe; that the infection was ascending into the foot; and that the plaintiff was in excruciating pain. Upon the plaintiffs admission to Hartford Hospital on August 17, 1995, Suecof performed an operative procedure to drain the infection and remove necrotic bone fragments and affected soft tissue from the toe. This surgery preserved vital tissue in the remaining toe structure, and was followed by a course of intravenous antibiotics which were started in the hospital and continued at home. In the course of the surgery to remove the infected tissue, trauma was caused to several nerve structures in the area of the plaintiff left foot. These interventions caused the plaintiff to suffer post-operative nerve pain and to limit her activities during the recuperation process.
While the plaintiffs infection was largely resolved by these procedures, she developed thick scar tissue and an overgrowth of the remaining bone in the site of this remedial surgery. This condition was painful and prevented the plaintiff from using any footwear other than sneakers. To reduce the bulk of the remaining portion of the toe so that the plaintiff could wear shoes, Suecof operated on April 17, 1996 at the Hartford Surgical Center, removing the scar and reshaping the remaining CT Page 7818 bone structures in the toe. This intervention also caused the plaintiff to suffer postoperative pain and to limit her activities during the recuperation process. Following this surgery, the plaintiff developed persistent irritation at the end of the toe, caused by the tissue that remained in that location. A third remedial operation was performed by Suecof on May 5, 1997, also at the Hartford Surgical Center, to remove the scarred skin, keloid tissue and underlying bone which were causing severe irritation. This procedure reduced the irritation, but effectively required amputation of any remaining toe tissue, so that the plaintiff was left permanently without any bony or soft tissue structures in that toe. This third remedial operative procedure also caused the plaintiff to suffer post-operative pain and to limit her activities during the recuperation process.
The plaintiff continues to have pain in the portion of the foot upon which the defendant performed his surgery, notwithstanding Suecofs efforts at correcting that condition. The plaintiff testified, without hyperbole, that the pain is not constant, but frequent and intermittent in nature. The pain has been described as "peripheral neuropathy," or nerve pain, by another podiatrist, Jeffrey Habershaw, who provided consultation for the plaintiff. The pain is especially bothersome at night. In response to this pain, the plaintiff has had to discontinue her usual vigorous exercise routine of aerobics, walking outdoors or on a treadmill, and she has developed emotional distress which is related to her inability to maintain the level of physical fitness that she previously enjoyed. In addition, the plaintiff remains unable to wear fashionable shoes, which she feels would better suit her management position at work.
The plaintiff is also concerned about the cosmetic appearance of her bare left foot because the loss of the fifth toe, amputated at the level of the large bones of the foot, is clearly visible. The appearance of this foot, with its absent fifth toe, causes others to take notice, and creates emotional distress, embarrassment and humiliation for the plaintiff.
The plaintiff lost no income as a result of her condition, as she was able to perform an acceptable portion of her work from home during the period of Suecof's remedial surgeries and the recuperation that followed.
 II STANDARD OF CARE AND DEVIATION THEREFROM
The plaintiff claims that the defendant was negligent in providing CT Page 7819 podiatric treatment to her and that he deviated from the applicable standard of care. The defendant denies these claims. Applying the principles of law as set forth herein to the testimony and evidence presented at trial, the court finds these issues in favor of the plaintiff.
In evaluating the plaintiffs claims of negligence in this matter, it is proper to "begin with the premise that a physician is required by law to exercise the degree of skill, care and dingence that is customarily demonstrated by physicians in the same line of practice. Logan v.Greenwich Hospital Assn., 191 Conn. 282, 300-302, 465 A.2d 294 (1983). A physician must exercise such reasonable skill and diligence in all aspects of providing care and treatment to a patient. Allen v. Giuliano,144 Conn. 573, 575, 135 A.2d 904 (1957). To prove that a physician has breached the legally required standard of care, a plaintiff must offer some evidence that the conduct of the physician was negligent. Snyder v.Pantaleo, 143 Conn. 290, 294, 122 A.2d 21 (1956)." Edwards v. Tardif,240 Conn. 610, 614, 692 A.2d 1266 (1997). In a malpractice action, "[i]t is not necessary for a plaintiff to prove all that he alleges; it suffices if he proves enough to sustain the judgment." (Internal quotation marks omitted.) Id., 621-22.
In honor of this premise, our courts have established a calculus which requires that "`[i]n order to prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed. . . . . . . . Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard.' (Citations omitted; internal quotation marks omitted.) Williams v.Chameides, 26 Conn. App. 818, 822-23, 603 A.2d 1211 [cert. denied,221 Conn. 923, 608 A.2d 689] (1992)." Stowe v. McHugh, 46 Conn. App. 391,397, 699 A.2d 279, cert. denied, 243 Conn. 932, 701 A.2d 662 (1997). See also Doe v. Yale University, 252 Conn. 641, 687-89, 689, ___ A.2d ___ (2000); Mather v. Griffin Hospital, 207 Conn. 125, 130-31, 540 A.2d 666
(1988); Campbell v. Palmer, 20 Conn. App. 544, 548, 568 A.2d 1064
(1990). The Appellate Court has affirmed the applicability of this standard of proof to cases, such as this, which raise claims of podiatric malpractice. "`To prove that a [podiatrist] has breached the legally required standard of care, the plaintiff must offer some evidence that the conduct of the [podiatrist] was negligent. . . . [T]estimony of an expert witness is necessary to establish both the standard of proper professional skill or care on the part of a [podiatrist] . . . and that the defendant failed to conform to that standard of care.' (Citations omitted; internal quotation marks omitted.) Keans v. Bocciarelli,35 Conn. App. 239, 241-42, 645 A.2d 1029, cert. denied, 231 Conn. 934, CT Page 7820650 A.2d 172 (1994)." (Brackets in the original.) Kunst v. Vitale,42 Conn. App. 528, 536, 680 A.2d 339 (1996) (expert testimony required in malpractice action against podiatrist). In order to hold a defendant liable in an action derived from the negligence of a health-care provider, the fact-finder should be restricted to credible expert testimony in resolving the issues of the applicable standard of care and whether that standard has been breached by the defendant. Doe v. YaleUniversity, supra, 252 Conn. 689.
In this matter, the court credits the testimony provided by the plaintiffs expert witness, Jeffrey Habershaw, on the subjects of negligence and causation. Habershaw is a skilled and experienced podiatrist who has a long history of treating patients as well as teaching and writing about podiatric medicine and surgery. Habershaw now serves an associate professor of surgery at Boston University Medical Center, after serving for a number of years as a clinical instructor in surgery at Harvard Medical School. Habershaw's testimony established, by a preponderance of the evidence, that the applicable standard of care prescribes that a minimum of six weeks elapse before elective podiatric surgical procedures are performed upon the same toe. Under the circumstances of this case, according to Habershaw's credible expert testimony, it was inappropriate and below the standard of care to perform a second elective surgery upon the plaintiff on July 21, 1995. Failure to allow adequate time to pass between surgeries, as described above, made it more likely that a postoperative complication by way of an infection would develop in the operative toe. In view of this hazard, the standard of care would permit premature re-operation only if there was a traumatic event causing deformity to the digit, or if infection had occurred. This witness's testimony confirmed that on July 21, 1995, the plaintiff had not completely healed from the June 1995 surgery. Habershaw credibly opined that even if the plaintiff had presented to the defendant on July 8, 1995, with a fractured toe, this condition would not represent an emergency circumstance requiring surgical intervention on July 21, 1995, absent deformity of the digit. There was no evidence presented from which this court reasonably could conclude that the plaintiff had suffered any such deformity to the involved digit, nor that she had developed an infection prior to the defendant's re-operation on July 21, 1995. The standard of care thus required that the toe be allowed to heal, under these circumstances, without any surgical intervention on July 21, 1995. The court credits the testimony of Habershaw to the effect that the defendant's elective surgery upon the same toe on July 21, 1995, under these circumstances, constituted a deviation from the standard of care.[4] See Kunst v. Vitale, supra,42 Conn. App. 536.
The court further credits Habershaw's testimony to the effect that the standard of care would be breached if the patient presented with an CT Page 7821 infectious condition on August 5, 1995, and the defendant waited until the August 8, 1995, visit to prescribe appropriate antibiotic therapy.[5]
The facts of this case indicate that the plaintiff presented with signs of infection on August 5, 1995, and reported these signs to the defendant, but that he nonetheless failed to timely and properly diagnose the presence of infection and prescribe antibiotics to her on that date, and instead delayed the provision of this requisite medication until August 8, 1995. Furthermore, the plaintiffs communication to the defendant on August 12, 1995, reporting the development of a large white blister on the toe, draining from the toe, swelling and the opening of the incision, along with the defendant's recommendation that the plaintiff obtain a specimen of the drainage and send the culture to him, all provide an adequate basis that the defendant was aware of the probable presence of an active infection in the toe at that time.[6]
The defendant's statement that he was not available to see the plaintiff on August 12th served to reassure the plaintiff that she could fare well without the defendant's prompt examination or treatment. The standard of care, credibly established by Habershaw, requires that treatment of an infection commence immediately upon recognition, in order to reverse the infectious process. Notwithstanding the defendant's claim to the contrary, Habershaw's testimony establishes the basis for the court's conslusion that the defendant failed to adequately diagnose and treat this infection, in a timely and proper manner, and that this negligence constitutes a deviation from the standard of care. See Kunst v. Vitale, supra, 42 Conn. App. 536.
Accordingly, the court finds that the plaintiff has proved, by a preponderance of the evidence, that the defendant was negligent, and deviated from the standard of care, by performing successive elective surgical procedures on the same toe prior to the expiration of appropriate healing time between surgeries; and by failing to timely and appropriately recognize, diagnose and treat the plaintiffs infection in that toe.
 III CAUSATION
The plaintiff claims that the defendant's negligence caused her to sustain and suffer certain damages and losses. The defendant denies these claims. Applying the principles of law as set forth herein to the testimony and evidence presented at trial, the court finds these issues in favor of the plaintiff.
In a case such as this, based upon allegations of a health-care provider's malpractice, the plaintiff bears a burden beyond that of CT Page 7822 proving negligence. Therefore, in evaluating this issue, the court has observed the further principle that requires the plaintiff to "establish a causal relationship between the [provider's] negligent actions or failure to act and the resulting injury by showing that the action or omission constituted a substantial factor in producing the injury."Edwards v. Tardif, supra, 240 Conn. 615. "No matter how negligent a party may have been, if his negligent act bears no relation to the injury, it is not actionable." Shegog v. Zabrecky, 36 Conn. App. 737, 745,654 A.2d 771, cert. denied, 232 Conn. 922, 656 A.2d 670 (1995). "In order for legal causation to exist, both actual cause and proximate cause must be present. Coste v. Riverside Motors, Inc., 24 Conn. App. 109, 113,585 A.2d 1263 (1991). Actual cause requires evidence that the plaintiffs injury would not have occurred in the precise way that it did without the defendant's conduct. Id. Proximate cause is defined as an actual cause that is a substantial factor in the resulting harm. . . . The `test' for proximate cause is whether the defendant's conduct was a `substantial factor' in producing the plaintiffs injury. . . . This substantial factor test reflects the inquiry fundamental to all proximate cause questions, namely, "whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence. . . ." (Citations omitted; internal quotation marks omitted.)." (Citations omitted.) Shegog v. Zabrecky, supra. 745. See also Stewart v. FederatedDepartment Stores, Inc., 234 Conn. 597, 607-08, 662 A.2d 753 (1995). "If a defendant's negligence was a substantial factor in producing the plaintiffs injuries, the defendant would not be relieved from liability for those injuries even though another force concurred to produce them.Miranti v. Brookside Shopping Center, Inc., [159 Conn. 24, 29, 266 A.2d 370
(1969)]. . . . (Citation omitted.) D'Arcy v. Shugrue, 5 Conn. App. 12,24-25, 496 A.2d 967, cert. denied, 197 Conn. 817, 500 A.2d 1336 (1985)." (Quotation marks omitted) Wagner v. Clark Equipment Co., 243 Conn. 168,180, 700 A.2d 38 (1997). "`[W]here the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.' (Internal quotation marks omitted.) Stewart v. Federated Dept.Stores, Inc., [supra, 234 Conn. 607-08]." Edwards v. Tardif, supra,240 Conn. 617. "`Whether a superseding cause was of such a character as to prevent an act of negligence of the defendant from being a substantial factor in producing a plaintiffs injury is ordinarily a question of fact. Corey v. Phillips, [126 Conn. 246, 254, 10 A.2d 370 (1939). Rodenv. Connecticut Co., 113 Conn. 408, 413, 155 A. 721 [1931].' Colligan v.Reilly, 129 Conn. 26, 30, 26 A.2d 231 (1942)." Wagner v. Clark EquipmentCo., Inc., supra, 243 Conn. 180. CT Page 7823
In a case such as this, "[e]xpert medical opinion evidence is . . . required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." Shegog v.Zabrecky, supra, 36 Conn. App. 745-46. "[T]he expert opinion must be based on reasonable probabilities. . . . An expert, however, need not use `talismanic words' to show reasonable probability . . . In other words, formulaic words are not essential when an expert renders an opinion as long as it is clear that the opinion of the expert is expressed in terms of probabilities." Id., 746.
In view of all the evidence related to the circumstances of this case, the court credits Habershaw's testimony related to the subject of causation of the plaintiffs injuries and losses, and finds that the plaintiff has met her burden of proving that the defendant's negligence was an actual and proximate cause of these injuries and losses. The court accepts this expert witness's consistent opinion that the defendant's care and activities in treatment, or lack of treatment of the plaintiffs toe served as a substantial factor in causing both the amputation of this digit and the plaintiffs corollary injuries and losses. See Wagner v.Clark Equipment Co., supra, 243 Conn. 180; Edwards v. Tardif, supra,240 Conn. 615; Shagog v. Zabrecky, supra, 36 Conn. App. 746. As Habershaw clearly explained, the defendant's negligence in prematurely reoperating on the fifth toe caused and created the conditions that led the tissues in this toe to become infected. As he further opined, the defendant's additional negligence in failing to provide the plaintiff with appropriate antibiotic treatment on August 5th, when she presented with indications of infection, his negligence in delaying the commencement of this treatment until August 8th, and his negligence in failing to respond appropriately to the plaintiffs complaints on August 12th, all caused the infection in the plaintiffs toe to persist and to affect such structures as the bones of the toe and the non-boney tissues of the toe and the foot. The subsequent amputation procedures were necessitated by the presence of infected bony tissue, or osteomyelitis, and necrotic soft tissue in the fifth toe. See Edwards v. Tardif, supra, 240 Conn. 615.
This court also finds credible, and consistent with the evidence, Habershaw's opinion that the surgeries required to address this infection and the complications in healing that required the necessary procedure that caused the loss of the plaintiffs toe, have all caused neuritic, or nerve, pain in this toe and foot, which pain continues today. This pain is likely to be permanent and it is not likely to be resolved through further surgical or non-surgical interventions. This pain was caused by the eventuality of having to encounter nerves in the area of the toe, in the course of the surgical procedures which were required to address the conditions caused by the defendant's premature intervention into the CT Page 7824 original operative site and the defendant's failure to timely and adequately treat the infection in that region. The defendant's negligence was thus a substantial factor in causing these conditions to occur. SeeEdwards v. Tardif, supra, 240 Conn. 615.
The court further credits Habershaw's opinions on the effect of the plaintiffs permanent injuries. The loss of the fifth toe has caused some measurable interference with the plaintiffs activities of daily living. As noted, the pain caused by the amputation procedures, necessitated by the defendant's negligence, is permanent in nature, and, consistent with the plaintiffs testimony, debilitating to her. The loss of the fifth toe, with the plaintiffs permanent but intermittent pain, taken together with its impact on her decreased ability to perform physical and fitness activities, and the loss of the fifth toe's service as a physical restraint for the fifth metatarsal bone in the left foot, has caused the plaintiff to sustain a five percent (5%) permanent partial disability to her whole person.
The plaintiff provided additional expert witness testimony on the subject of causation through Larry Suecof. The court credits Suecof's opinion that the surgeries and treatments he performed on August 17, 1995, were necessarily undertaken to cure the infectious process that developed in conjunction with the defendant's second surgery. The court further credits Suecofs opinion that the surgeries he thereafter performed, on April 17, 1996 and May 5, 1997, with attendant post-operative treatments, were all necessary consequences of the surgery which was performed on August 17, 1995, to cure the plaintiffs infection. Suecof's concurred with Habershaw in establishing that the plaintiffs permanent loss of her fifth left toe, with the conditions noted above, caused her to sustain a five percent (5%) permanent partial disability.
The defendant also provided expert witness testimony on the subject of negligence and causation, through David Roccapriore, a podiatrist with board certification in a number of specialty areas. Roccapriore's testimony was consistent with Habershaw's, and credible, regarding the absence of an emergency or necessity for the defendant to re-operate on the plaintiffs toe on July 21, 1995, as non-surgical management methods were available and the hammertoe repair was a wholly elective procedure. Roccapriore's testimony was also credible in his acknowledgment that the presence of pus and bleeding from the wound, reported by the plaintiff on August 5, 1995, would be consistent with an infection, and that the standard of care would require administration of appropriate antibiotics. The court finds that Roccapriore's opinions on these subjects confirm Habershaw's testimony establishing the defendant's negligence in these areas. The court determines that the plaintiffs CT Page 7825 expert, Habershaw, "was more credible than that of the defendant" on the remaining issues of both negligence and causation. Keans v. Bocciarelli, supra, 35 Conn. App. 242.
Thus, consistent with the permanent partial disability described above, the court further finds that the defendant's negligence was a substantial factor in causing the plaintiff to sustain a permanent, painful condition known as "peripheral neuropathy" in her left foot, that this pain is intermittent in nature and causes interference with the plaintiffs usual daily activities. As a result of this pain, the plaintiff has been caused to discontinue performing her customary routine of aerobics and exercise-walking, and she has suffered emotional distress due to her inability to participate in these physical fitness activities. In addition, the pain prevents the plaintiff from wearing fashionable shoes, causing her further emotional distress. The plaintiffs concern about the cosmetic appearance of her bare left foot, with its absent fifth toe which draws the prurient attention of others, causes additional emotional distress, embarrassment and humiliation for the plaintiff, who will permanently bear all these effects of the defendant's negligence.
The plaintiff has further proved that she has incurred the following financial obligations as a result of the defendant's negligence:
Walk In Medical Care August 13, 1995 $ 49.00
Hartford Hospital August 17-21, 1995 5,207.36
Hartford Surgical Center April 17, 1996 1,586.00
Hartford Surgical Center May 5, 1997 1,122.00
TOTAL $ 7,964.36
In sum, the court finds that the plaintiff has proved, by a preponderance of the evidence, that the negligent care and treatment provided by the defendant has proximately caused her to suffer: physical loss of her left fifth toe; the deformity and disfigurement that are the permanent results of the loss of that toe; emotional distress and humiliation due to the absence of her fifth left toe; pain in connection with requisite surgical procedures upon that toe and the recuperative processes that followed, along with permanent intermittent nerve pain in the left foot; diminution of her physical abilities, requiring a change in her lifestyle from active to semi-sedentary, with loss of the joy and other rewards she previously gained through physical exercise; financial responsibility for remedial health care; a five percent (5%) permanent CT Page 7826 partial disability of the whole person; and economic damages in the amount of $ 7,964.36.
 IV INTERVENING OR SUPERVENING NEGLIGENCE
The defendant claims that even if he violated the standard of care owed to the plaintiff, any damages she sustained were not due to his negligence, but to the care and attention provided by a third party, the Walk-In Office, on August 13, 1995. The defendant argues that the Walk-In Office's care constituted "an intervening and superseding cause of the Plaintiffs injuries and Dr. Bell cannot be held liable for those injuries." (Defendant's Post Trial Brief, p. 5 (April 16, 2000). In the absence of an apportionment claim,[7] the defendant argues that he has presented evidence which supports his proposition that the plaintiffs treatment at the Walk-In Office was the proximate cause of her injuries, including the amputation procedures and permanent neuritic pain.
Connecticut law recognizes that ""[e]ven if a plaintiffs injuries are in fact caused by a defendant's negligence, a superseding cause may break that causal connection if it "so entirely supersedes the operation of the defendant's negligence that it alone, without his negligence contributing thereto in any degree, produces the injury; or it must be the non-concurring culpable act of a human being who is legally responsible for such act." Corey v. Phillips, supra, [126 Conn. 255].'" Wagner v.Clark Equipment Company, Inc., supra, 243 Conn. 180. However, as noted above, "[i]f a defendant's negligence was a substantial factor in producing the plaintiffs injuries, the defendant would not be relieved from liability for those injuries even though another force concurred to produce them." (Citations omitted.) Id.
The defendant bears the burden of proving that a third party's negligence acts to exonerate him from liability in this matter. SeeWagner v. Clark Equipment Co., Inc., supra, 243 Conn. 179.; see generally 2 Restatement (Second), Torts §§ 440 through 453. The defendant's argument rests, in part, upon his assumption that the plaintiff was treated by a physician at the Walk-In Office, who would be presumed to have a higher degree of training and skill in the treatment of infections than would a podiatrist. Here, a careful examination of the evidence fails to support any reasonable conclusion other than that the plaintiff received direct attention and treatment from a physician's assistant, not a medical doctor or surgeon, at the Walk-In facility.[8]
In this matter, having considered the evidence, the court determines that the care provided to the plaintiff at the Walk-In Office was not CT Page 7827 proved to be a superseding cause of such character as to prevent the defendant's negligence from being a substantial factor in producing the plaintiffs injuries. The court is not, accordingly, persuaded by the defendant's argument on this issue, where he has failed to meet his burden of proof. Wagner v. Clark Equipment Co., supra, 243 Conn. 180.
 V MITIGATION OF DAMAGES
The defendant further argues that even if he violated the standard of care he owed to the plaintiff, any damages she sustained as the result of post-operative infection were not caused by his care, but were due to the plaintiffs failure to mitigate any ill effects that may have been caused by his negligence. The defendant bears the burden of proving a plaintiffs failure to mitigate her damages. Keans v. Bocciarelli, supra,35 Conn. App. 243. "To claim successfully that the plaintiff failed to mitigate damages, the defendant `must show that the injured party failed to take reasonable action to lessen the damages; that the damages were in fact enhanced by such failure; and that the damages which could have been avoided can be measured with reasonable certainty.'" (Citation omitted, emphasis added.) Preston v. Keith, 217 Conn. 12, 22, 584 A.2d 439
(1991). The court finds that the defendant has failed to establish, by sufficient and credible evidence, that any specific measure of the plaintiffs losses were caused or enhanced by her failure to mitigate the damages. Additionally, the defendant has failed to prove, by a preponderance of the evidence, the amount of damages that thereby could have been avoided. Accordingly, the court declines the opportunity to ascribe sufficient weight to this aspect of the defendant's argument to enable him to prevail on this issue. Id.
 VI FUTURE ECONOMIC DAMAGES
The plaintiff argues that she is entitled, in this case, to an award of future economic damages, in anticipation of such surgery as she may require to address potential problems that could develop from increased impact on the remaining left fourth toe, or irritation to the fifth toe stump. The plaintiff has attempted to support this claim through references to future conditions, presented in a letter from Suecof dated February 27, 1998. Plaintiffs Post-Trial Memorandum, p. 3 (April 7, 2000) The plaintiff notes therein, inter alia, Suecofs reference to "the possibility" that the plaintiff may form scarring or pain at the end of the toe that would require additional surgery. Id. Suecof states that "[i]t would not be surprising" if the plaintiff developed irritation at CT Page 7828 the end of her toe that would require additional surgery. Id. The practitioner reports his own "significant experience in performing over 300 amputations per year" to bolster his opinion that "once an amputation starts things happen usually in the future and up to ten years or even longer after this that frequently require surgical intervention. Estimates of further costs could approximate up to $ 10-15,000, over her lifetime, if further surgery/reconstruction is required." (Emphasis added.) Id.
While Suecofs testimony on other subjects is cogent and convincing, the court cannot credit this expert's opinions on the subject of future economic damages, or the future noneconomic damages that might be related thereto. At trial, Suecof admitted that he had overstated his experience with amputations, as podiatrists were not permitted by law to perform amputations before 1998. The court thus finds that the witness had based his own estimate of the reasons why the plaintiff may need future
surgical care upon an inadequate foundation.
In addition, the court finds that the letter of February 27, 1998 provides an insufficient basis for conclusion that the reported estimate of future medical expenses is based upon an estimate of reasonable probabilities, rather than possibilities. "It is well established that `[i]n assessing damages in a tort action, a trier is not concerned with possibilities but with reasonable probabilities.' Sheiman v. Sheiman,143 Conn. 222, 225, 121 A.2d 285 (1956). Consequently, as we stated in Jerzv. Humphrey, 160 Conn. 219, 224, 276 A.2d 884 (1971), `as to future medical expenses, the jury's determination must be based upon an estimate of reasonable probabilities, not possibilities.' Indeed, we expressly reaffirmed this principle in Seymour v. Carcia [221 Conn. 473, 481,604 A.2d 1304 (1992)]. The obvious purpose of this requirement is to prevent the jury from awarding damages for future medical expenses based merely on speculation or conjecture." Marchetti v. Ramirez, 240 Conn. 49,54-55, 688 A.2d 1325 (1997). While proof of future medical medical expenses need not be founded upon the same degree of certainty as past medical expenses, and while future medical expenses may be properly calculated based upon historical expenditures for medical care, the proponent must establish a reasonable "`degree of medical certainty thatfuture medical expenses will be necessary.'" (Emphasis in the original.) Marchetti v. Ramirez, supra, 240 Conn. 54-55, quoting Seymour v. Carcia, supra, 221 Conn. 478-79.
Viewed in the context of the legal standard required for proof of future medical standards, it is clear that Suecofs letter of February 27, 1988, albeit presenting the opinions and communcations of this podiatric expert, establishes nothing more than that the plaintiff might possibly need future treatment. Even taken together with the plaintiffs CT Page 7829 history of multiple necessary surgical repairs to the site originally operated upon by the defendant, and with her credible claims that she still suffers pain, the evidence provided in this case does not remove "the issue of future medical expenses from the realm of conjecture."Marchetti v. Ramirez, supra, 240 Conn. 55. Considering the content of Suecofs letter in its entirety, with reference to possibilities and surprises, the court finds that such evidence on the subject as is now in the record is insufficient for consideration of the element of future medical expense. Id.
Under all these circumstances, the court should not speculate as to whether it is likely that future medical expenses will be incurred by the plaintiff, nor should the court speculate as to what any future surgeries may cost. Since the plaintiff has failed to satisfy her burden of proof on this element of her claim, she is not entitled to compensation for future economic damages.
 VII CONCLUSION
Based on the foregoing findings of fact and applicable principles of law, the court concludes that the plaintiff has met her burden of proving, by a preponderance of the evidence: first, the requisite standard of care for treatment of the conditions that she presented to the defendant; second, that the defendant's treatment constituted a deviation from that standard of care; and third, that a legal causal connection existed between the deviation and the injuries claimed by the plaintiff. See Stowe v. McHugh, supra, 46 Conn. App. 397; Mather v.Grffin Hospital, supra, 207 Conn. 130-31; Campbell v. Palmer, supra,20 Conn. App. 548.
The court therefore returns a verdict in favor of the plaintiff, and awards fair, just and reasonable damages in accordance with the following calculation:
A. Economic Damages (past) $ 7,964.36
B. Economic Damages (future) $ 0.00
C. Noneconomic damages $ 135,000.00
TOTAL $ 142,964.36
 BY THE COURT, N. Rubinow, J.
CT Page 7830