PATRICIA VAN STEENSBURG *v.* LAWRENCE &
MEMORIAL HOSPITALS ET AL.
(11925)

SPEZIALE, C. J., HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued June 13—decision released September 4, 1984

*Chester Fairlie,* for the appellant (plaintiff).

*Thomas C. Thornberry,* for the appellees (defendant
Louis H. Reich, P.C., et al.).

ARTHUR H. HEALEY, J. The principal issue on this
appeal is whether the trial court erred in instructing
the jury with regard to the standard of care that the
defendant[1] owed to the plaintiff.

The following salient facts, which the jury could rea-
sonably have found, are not in dispute: On December

---

[1] The plaintiff had settled her case with the named defendant prior to
trial and the case went to trial only against Louis H. Reich, M.D., and Louis
H. Reich, P.C.

28, 1978, the plaintiff, Patricia Van Steensburg, was admitted to the Lawrence & Memorial Hospitals (Lawrence & Memorial) located in New London, under the care of the defendant, Louis H. Reich, M.D., a psychiatrist. The plaintiff had been referred to Lawrence & Memorial by her treating physician at the submarine base hospital (sub base) in Groton where she had been admitted two days earlier displaying signs of toxic psychosis.

The defendant examined the plaintiff upon her arrival at Lawrence & Memorial. At that time he took a medical history and made a psychiatric evaluation. The defendant had before him the sub base records concerning the plaintiff's treatment there. Of these records, the defendant read only the "abbreviated medical record" which he considered to be the same as a discharge summary. This abbreviated medical record was one page in length. The balance of the sub base records included doctor's orders and doctor's progess notes as well as nursing assessments and nursing notes.

The plaintiff was admitted into Lawrence & Memorial and the defendant decided to assign her to a private room and not a security room. Lawrence & Memorial had security rooms which were intended for the short-term care of psychiatric patients. These rooms had wire mesh on their windows to prevent falls. No special security measures or supervision were ordered by the defendant.[2] The defendant ordered medication to treat the plaintiff's condition, which he had diagnosed as toxic psychosis. He also ordered complete blood work, chemistry profile, thyroid profile, urinalysis and an internal medicine consultation.

---

[2] The defendant testified that he believed that routine supervision by the nursing staff would be adequate. This supervision included checking on a patient "somewhere between every [one] hour to every two hours, most likely every hour."

On December 29, 1978, the day following her admission, the plaintiff's condition was improved[3] and the defendant discussed the plaintiff's condition with the nurses who had been on duty and had contact with her. On the following day, December 30, the plaintiff was again examined by the defendant. Later that day, at approximately 1 p.m., the plaintiff was found lying on the pavement outside the hospital below the window of her third floor room through which she had apparently either jumped or fallen. This resulted in her suffering various injuries.

The plaintiff then brought this action claiming that her "injuries were caused by the failure of the [d]efendant . . . to utilize the degree of skill and care appropriate in treating a person in the [p]laintiff's condition."[4] After a jury trial which included the tes-

[3] The defendant testified that on December 29, 1978, the day following the plaintiff's admission, he observed the plaintiff to be "concerned with regaining health and returning home [and that] she den[ied] any suicidal ideation" and he had stated this in the plaintiff's progress record. Referring to the notations which he made in the plaintiff's progress record on that day, he testified, "[t]hat was my notation, meaning that when asked whether she had any thoughts of committing suicide, she denied them. She denied having any thoughts; and as a matter of fact, she was looking forward towards the future. She was speaking to me about getting well. She wanted to get well. She wanted to go home and be with her family. Patients who are thinking of taking their [lives] usually are not making plans for the future."

The plaintiff's progress record was entered into evidence as a full exhibit.

[4] The plaintiff's complaint alleged that the defendant's services "fell below the applicable standard of care in one or more of the following respects:

"A. In that he failed to institute proper and adequate procedures to treat and supervise the Plaintiff during a period of mental illness including an acute psychotic episode;

"B. In that he failed to issue orders for adequate supervision through nurses, nurse's aides and attendants to prevent the Plaintiff from injuring herself when he knew or should have known of the dangerous state of her mental condition;

"C. [I]n that he failed to place the Plaintiff in a confined, secure and supervised quarters appropriate for the care of a person in the mental state of the Plaintiff;

"D. [I]n that he allowed the Plaintiff to be alone in a room with windows

timony of various experts who expressed their opinions on the standard of care owed by the defendant to the plaintiff and whether that standard was breached, the jury found in favor of the defendant and a judgment was entered accordingly. The plaintiff then took this appeal.

The plaintiff's claim of error on this appeal centers on the trial court's instructions to the jury concerning the applicable standard of care. The plaintiff points to what she refers to as the rules, regulations, policies, and physical facilities of Lawrence & Memorial which she claims contribute to defining a standard of care which is "at least to some degree unique" to that hospital and that this should have been the focal point of the jurors' considerations. She claims that the rules, regulations, and policies of Lawrence & Memorial contributed to a standard of care different from and more protective than the standard of care claimed by the defendant to exist on a statewide basis. Specifically, the plaintiff points to a provision in the Lawrence & Memorial rules and regulations which, as conceded by the defendant at trial, required the defendant to take a complete medical history and the testimony by her expert witness that the defendant's failure to read the full medical records of the sub base fell below the standard of care, skill and diligence within the New London locality. The plaintiff also refers to the security

---

which could be opened from the inside despite the fact that the Defendant knew or should have known that the Plaintiff suffered from severe depression and preoccupation with death and disorientation.

"E. [I]n that the Defendant placed the Plaintiff in an improperly designed psychiatric facility in one or more of the following respects:

"1. in that the room in which the Plaintiff was placed was at the end of a wing at a point far from the nursing observation desk;

"2. in that the Defendant placed the Plaintiff in a room, the interior of which was blocked from view from the nursing observation point;

"3. in that he failed to have a trained member of the staff stationed in a position to observe the Plaintiff after that point in time when she began to exhibit erratic and disoriented behavior."

room policies of Lawrence & Memorial.[5] It is in connection with these security room policies that she refers to the unique facilities and staffing of Lawrence & Memorial, specifically pointing out that Lawrence & Memorial was a "general hospital" without a psychiatric ward. In this regard, she points out that the hospital used "combinations of medical rooms and security rooms," the latter of which had wire mesh on their windows to prevent falls while the former did not. She points to the testimony of her expert witness that, taking into consideration the security room policies, which had a bearing on the standard of care at Lawrence & Memorial, the defendant did not meet that standard and his failure to do so was a substantial factor in causing her to fall or jump through the window of her room.

At trial, the plaintiff's counsel had requested in writing that the jury be instructed on the standard of care as follows: "As the plaintiff's private physician, the doctor was under a duty to his patient to exercise that degree of care, skill and diligence which a psychiatrist in New London, Connecticut ordinarily possessed and exercised in similar cases. You may also consider the standard of care, skill and diligence as it existed throughout the state of Connecticut to the extent that you find that standard to apply to the facts in this case. *Katsetos* v. *Nolan,* 170 Conn. 637 [368 A.2d 172] (1976); *Pisel* v. *Stamford Hospital,* 180 [Conn.] 314, 334–335 [430 A.2d 1 (1980)]."

The trial court, however, did not adopt the plaintiff's request and it instructed that the appropriate standard of care in this case was the standard of reasonable care and diligence of a psychiatrist in the community, general neighborhood or area in December of 1978 and that

[5] The "Security Room Policies" were written policies which classified psychiatric patients and the levels of care which a physician could specify in his orders.

although it was "alleged that the neighborhood was New London . . . [w]e now consider the entire State of Connecticut as the general neighborhood."[6] The plaintiff objected and excepted to the trial court's charge and in doing so she referred to her requested charge.

The plaintiff claims that the trial court erred in not giving her requested instruction or one "similar" to her request which would have instructed the jury that it could consider the rules, regulations and policies of Lawrence & Memorial. She also claims that the court's instructions were "materially harmful" in that they "directed" the attention of the jury away from the "unique" standards of the New London locality to a less protective statewide standard of care. We disagree.

The gist of the plaintiff's claim of error on this appeal is aimed at the trial court's instruction on the standard of care and the relationship of the rules, regulations

---

[6] The trial court's charge on the standard of care was as follows: "Now, the Plaintiff cannot make a recovery against the Defendant unless there is medical or expert testimony that the Defendant failed to conform to the standard of reasonable care and diligence of a psychiatrist in this community in December of 1978. Now, we've used the term 'in the community' or 'in the area'; but in recent years, because of advanced methods of communication and transportation, the community is no longer the town or city where the incident happened to have occurred. We now pretty much use the entire State of Connecticut as the community. So, therefore, when I refer to the word 'community' or 'area,' I would mean the standard set throughout the State of Connecticut. You determine, ladies and gentlemen, based on the testimony in the case of doctors and not upon your own knowledge as laymen what the Defendant's duty was under the circumstances and whether there was a proven—whether there was proven an alleged breach of that particular duty. It was the duty of doctor—the Defendant, Dr. Reich, to exercise that degree of care, skill, and diligence in the treatment of Mrs. VanSteensburg which psychiatrists in the same general area or same general neighborhood in the same line of practice ordinarily possessed and exercised in similar cases in December, 1978. It's alleged that the neighborhood was New London; but as I said before, it goes beyond that. We now consider the entire State of Connecticut as the general neighborhood."

and policies of Lawrence & Memorial to the standard of care. In this regard, we point out that hospital rules, regulations and policies do not themselves establish the standard of care. *Darling* v. *Charleston Community Memorial Hospital,* 33 Ill. 2d 326, 332, 211 N.E.2d 253 (1965), cert. denied, 383 U.S. 946, 86 S. Ct. 1204, 16 L. Ed. 2d 209 (1966); *Williams* v. *St. Claire Medical Center,* 657 S.W.2d 590, 594–95 (Ky. App. 1983); *Bly* v. *Rhoads,* 216 Va. 645, 653, 222 S.E.2d 783 (1976). The failure to follow such rules and regulations is, however, evidence of negligence. *Ziegert* v. *South Chicago Community Hospital,* 99 Ill. App. 3d 83, 97–99, 425 N.E.2d 450 (1981); *Boland* v. *Garber,* 257 N.W.2d 384, 385–87 (Minn. 1977); *Foley* v. *Bishop Clarkson Memorial Hospital,* 185 Neb. 89, 93, 173 N.W.2d 881 (1970). Therefore, the plaintiff's claims which relate specifically to that part of the trial court's instructions which stated that a statewide standard of care was to be used in this case cannot be accepted.[7]

At the time of trial, the applicable standard of care was well established. See *Fitzmaurice* v. *Flynn,* 167 Conn. 609, 616–17, 356 A.2d 887 (1975).[8] The trial court's instructions, to which we have already referred, accurately related that standard to the jury.

---

[7] We point out that in oral argument before us the plaintiff specifically stated that she was not claiming that the New London locality had a higher standard of care than the established statewide standard. Indeed, our perusal of the trial transcript before us demonstrates that the plaintiff did not offer evidence to establish that a higher standard of care had been established there. We therefore do not reach the question of whether a physician may be held to a local standard of care where it has been established that the locality does in fact hold physicians to a "standard of care" which is more demanding than the statewide or nationwide standards.

[8] In *Fitzmaurice* v. *Flynn,* 167 Conn. 609, 616–17, 356 A.2d 887 (1975), we stated that " '[a] physician is under a duty to his patient to exercise that degree of care, skill and diligence which physicians in the same general neighborhood and in the same general line of practice ordinarily possess and exercise in like cases. . . .' [T]he general neighborhood is the entire state of Connecticut." (Citations omitted.)

We point out that while we have since broadened the geographic limita-

It is well settled that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. *Oberempt* v. *Egri,* 176 Conn. 652, 656, 410 A.2d 482 (1979); *Kosko* v. *Kohler,* 176 Conn. 383, 390, 407 A.2d 1009 (1978). The test is whether the charge as a whole fairly presented the case so that no injustice was done. *Kosko* v. *Kohler,* supra; see *Kiniry* v. *Danbury Hospital,* 183 Conn. 448, 456, 439 A.2d 408 (1981).

On several occasions throughout its charge, after instructing the jury that it was to employ a statewide standard of care, the trial court referred specifically to the testimony of the plaintiff's expert witness and his opinion that the defendant had not met the standard of care due to the plaintiff in several ways including his failure to read all of the medical records from the sub base and his failure to place the plaintiff in a security room or provide special supervision. The trial court reviewed each allegation of negligence in the plaintiff's complaint and specifically developed the evidence adduced from the expert witnesses presented by both parties. The testimony of the plaintiff's expert, which the trial court discussed, had included the evidence concerning the rules, regulations and policies of Lawrence & Memorial, and their relevance to the standard of care which the plaintiff claimed the defendant had not met. The testimony of the defendant's expert witnesses, which the trial court also discussed, supported the defendant's claim that he had met the standard of care due to the plaintiff. The trial court, on each occasion, made no reference as to what testimony the jury should credit. It instructed the jury to review all of the evidence and it emphasized on numerous occasions that, based upon the testimony of the defendant's

tion to include the entire nation; *Logan* v. *Greenwich Hospital Assn.,* 191 Conn. 282, 301, 456 A.2d 294, (1983); that standard is not claimed by any of the parties to be applicable to this case.

and the plaintiff's experts, it was for the jury to determine whether the defendant breached the standard of care which he owed to the plaintiff.

It is significant in this case that the plaintiff makes no reference to this part of the trial court's charge and indeed no serious claim could be made by her that the trial court's comments regarding the evidence were unfair or unreasonable and thus presented the case to the jury in an unjust manner so as to amount to an abuse of its discretion. See *State* v. *Ballas,* 180 Conn. 662, 680, 433 A.2d 989 (1980); *Tezack* v. *Fishman & Sons, Inc.,* 173 Conn. 183, 186, 377 A.2d 272 (1977); *Laffin* v. *Apalucci,* 128 Conn. 654, 657, 25 A.2d 60 (1942).

Moreover, neither the plaintiff's request to charge nor her argument in excepting to the court's charge distinctly referred to the rules, regulations and policies of Lawrence & Memorial and their relevance on the issue of the alleged negligence of the defendant. Indeed, we find it puzzling that the plaintiff claims on appeal that the trial court's charge essentially took away from the jurors' consideration the rules, regulations and policies of Lawrence & Memorial. When the plaintiff's counsel explained his objections to the trial court's charge, the following colloquy took place: "Mr. Fairlie: I don't want your amended charge to tie into security policies. That may give Mr. Thornberry grounds for error if it comes up. This is what I would suggest, that Your Honor can indicate to the jurors, in deciding whether the Plaintiff's condition warranted security rooms or closer supervision or supervision, the jurors may consider suicidiality [sic], which is the—and acute toxic psychoses and toxic psychoses to the extent that the jurors find that supported by the evidence and to apply in this case. Just—I don't want to tie it too much into the security room policies because they may

have been discretionary.[9] To the extent that they find that those existed, they may decide how they applied to the issue of security.

"The Court: I don't quite follow—

"Mr. Fairlie: All right, I'll defer to Your Honor—"[10]

We cannot conclude that the trial court's charge to the jury on the standard of care took away from the jurors' consideration the rules, regulations and policies of Lawrence & Memorial. The trial court's charge fairly summarized the evidence presented by both parties and the opinions which each of the expert witnesses had expressed concerning whether the defendant had met the standard of care he owed to the plaintiff. We cannot find anything in the trial court's charge which could

[9] An important portion of the plaintiff's direct examination of her expert witness involved a lengthy hypothetical question which consumes about ten pages in the trial transcript. A portion of that question posited that the Lawrence & Memorial Hospital had "hospital policies" in effect "called 'Security Room Policies' indicating that one purpose of security rooms was to provide care of psychiatric patients for short periods of time . . . ." It further posited that "[p]hysicians at the hospital could use their *discretion* in admitting patients to those rooms." It is thus clear that the plaintiff introduced evidence that the security room policies were discretionary and not mandatory.

[10] Thereafter, the court recalled the jury and instructed them as follows: "My bringing you back out here is not to emphasize this over any other part of the charge that I've given you before; but when I was charging in regard to Paragraph 12 [of the plaintiff's complaint which sets out the plaintiff's allegations of negligence] dealing with the claim of malpractice against the Defendant Reich, with reference to the security room policy, I think I did discuss with you the claim about suicidal ideation. I mentioned the different doctors' interpretations of the preoccupation with death and things of that nature. But in addition, the Plaintiff claimed that the Defendant was negligent in failing to put her in a secured room, not only because of suicidal intent where she might have caused harm to someone else or to herself, but also because of acute or toxic psychosis or as a result of organic brain syndrome, which are elements within the security policy where one could have been placed in a security room. So I did not mean to preclude any other condition when I only mentioned suicide. That's all. I wanted to bring you out to tell you you may consider other aspects if you so find that they have been proven; it is not just suicidal intent or ideation."

fairly be said to undermine the evidence presented by the plaintiff, through her expert, concerning the bearing which the rules, regulations and policies of Lawrence & Memorial had on this case. To the extent that the trial court's instructions did not refer as specifically as possible to the rules, regulations and policies of Lawrence & Memorial, we conclude, based upon our review of the charge as a whole, that the plaintiff has not demonstrated that she has been prejudiced. See *McKiernan* v. *Caldor, Inc.,* 183 Conn. 164, 167, 438 A.2d 865 (1981); *Kosko* v. *Kohler,* supra, 387.

There is no error.

In this opinion the other judges concurred.