James A. LAW

v.

Walter A. CAMP, MD and Dickerman Hollister Jr., MD.

James A. Law, Executor of the Estate of Janice C. Law and James A. Law

v.

Greenwich Hospital, et al.

Nos. Civ.3:96CV2147(AHN), 3:96CV2148(AHN).

United States District Court, D. Connecticut.

July 26, 2000.

John Vecchiolla, Robert H. Law III, Greenwich, CT, for plaintiff.

Robert Kiley, Hartford, CT, Lois B. Tanzer, Hartford, CT, William J. Wenzel, Bpt., CT, Michael Neubert, New Haven, CT, W. Patrick Ryan, Stamford, CT, for defendant.

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

NEVAS, District Judge.

These two consolidated actions arise out of the hospitalization and subsequent death of Janice C. Law ("Mrs.Law"). The first, 3:96cv2147(AHN), is a fraud action brought by James A. Law ("Law"), Mrs. Law's son, individually against Walter A. Camp, M.D. ("Camp") and Dickerman Hollister Jr, M.D. ("Hollister"). The second, 3:96cv2148(AHN), is a medical malpractice action brought by Law, individually and as executor of the estate of Mrs. Law. The defendants in the second action are Greenwich Hospital (the "Hospital"), Frank Corvino, CEO and President of the Hospital, and Bruce Warwick, Chairman of the Hospital's Board of Trustees, James Brunetti, M.D. ("Brunetti"), Mitchell Kline, M.D. ("Kline"), Wei–Nchih Lee, M.D. ("Lee"), (collectively the "Hospital Defendants"), and four other physicians: Dr. Camp, Dr. Hollister, Francis Walsh, M.D. ("Walsh"), and Arthur Rosenberg, M.D. ("Rosenberg").

Presently pending before the court is Law's motion for partial summary judgment in the malpractice action [doc. # 196], the Hospital Defendants' motion for summary judgment in the malpractice action [doc. # 227], Dr. Walsh's and Dr. Rosenberg's motions for summary judgment in the malpractice action [doc. # 262 and doc. # 259], and Dr. Camp's and Dr. Hollister's motions for summary judgment in both actions [doc. # 267 and doc. # 243].

For the following reasons, Law's motion is DENIED. The motions of the Hospital Defendants, Dr. Camp, Dr. Hollister, Dr. Walsh and Dr. Rosenberg are GRANTED.

### RELEVANT PROCEDURAL BACKGROUND

Discovery in these cases has been contentious and lengthy. The parties have appeared before Magistrate Judge Holly B. Fitzsimmons on a frequent and routine basis. She has issued numerous discovery rulings, one of which ordered Law to disclose his expert witnesses by December 15, 1998. On December 12, 1998, he disclosed Arthur Kaufman, M.D. ("Kaufman"). On December 14, 1998, he disclosed S. Murphy Vishnubhakat, M.D. ("Vishnubhakat"). On June 3, 1999, the magistrate judge denied Law's request for an extension of time to disclose additional expert witnesses. On June 3, 1999, and November 22, 1999, she ruled that Law was precluded from designating further expert testimony regarding the standard of care. Nonetheless, on February 2, 2000, Law disclosed Jay B. Krasner, M.D. as a "rebuttal" expert witness. On June 2, 2000, the defendants' motion to preclude the testimony of this witness either in support of or in opposition to summary judgment or trial was granted.

Discovery is now over. Law's previous motion for summary judgment in the fraud action was denied on the ground that there were material issues of fact in dispute.

### STANDARD OF REVIEW

A motion for summary judgment may be granted if the court determines that there

are no genuine issues of material fact to be tried and that the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a Rule 56 motion, the court's responsibility is not to resolve disputed issues of fact, but to assess whether there are any factual issues to be tried, while resolving all ambiguities and drawing all reasonable inferences against the moving party. *See Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Eastway Constr. Corp. v. City of N.Y.*, 762 F.2d 243, 249 (2d Cir.1985)); *see also Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). The substantive law governing a particular case identifies the facts that are material. *See Anderson*, 477 U.S. at 258, 106 S.Ct. 2505. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

Summary judgment may be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that reasonable minds could not differ as to the material facts. *See Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993); *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991); *Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

### FACTS

The following facts are undisputed unless otherwise indicated.

On or about October 19, 1994, Mrs. Law, a 64 year old diabetic, began to note weakness, low grade fever, a nonproductive cough, frequent urination and anorexia and malaise. On October 26, 1994, Mrs. Law was seen by her internist, Dr. Walsh, at his office. She had a low-grade fever and an elevated blood glucose level. Dr. Walsh decided to hospitalize her to control her diabetes and to evaluate the cause of her fever.

At approximately 1:00 p.m. on October 26, 1994, Mrs. Law arrived at the Hospital emergency room. She was evaluated by Dr. Walsh, Dr. Brunetti and a medical resident who is not a defendant in this action. She was diagnosed with a urinary tract infection and elevated blood sugar. She was treated in the emergency room with intravenous saline, insulin and acetaminophen. Dr. Walsh admitted her to the Hospital for treatment of the infection, to look for all other possible sources of infection, and to treat her for possible sepsis. He put her on Unasyn, a broad-based antibiotic, and insulin.

After Dr. Walsh admitted Mrs. Law to the Hospital, he contacted Dr. Hollister by telephone and arranged for him to be Mrs. Law's attending physician because Dr. Walsh was leaving town to attend a meeting.

Dr. Brunetti was in charge of Mrs. Law's care during the night of October 26–27, 1994. At 7:45 a.m. on October 27, Mrs. Law suffered pulmonary arrest. At 7:48 a.m. she suffered respiratory arrest. Cardiopulmonary resuscitation was performed. After about twenty-five minutes cardiac function was restored. Mrs. Law was intubated and placed on a mechanical ventilator (life support). She was transferred to the ICU in a deep coma. She incurred extensive neurological damage as a result of the arrest. Dr. Brunetti had no further involvement in Mrs. Law's care or treatment after she was transferred to the ICU. Dr. Lee and Dr. Kline, Hospital residents, were involved in the resuscitation and in Mrs. Law's care and treatment in the ICU.

Dr. Camp, chief of neurology at the Hospital, was called in for a neurological consultation. He examined Mrs. Law several times on October 27 and 28. During those two days, Mrs. Law remained in an

unresponsive state, with, among other things, fixed, dilated pupils, no response to external stimuli or pinpricks, no purposeful movements, and no blink reflex. Dr. Camp confirmed to Dr. Hollister that Mrs. Law was irreparably brain damaged and irreversibly unconscious, with no hope for neurological recovery.

Dr. Camp met with Mrs. Law's family during the afternoon of October 28. Dr. Hollister and Dr. Lee were present for at least some of the meeting. The facts relating to what was said by Dr. Camp and Dr. Hollister during the meeting relating to Mrs. Law's condition are disputed. Dr. Hollister and Dr. Camp assert that the family was told that Mrs. Law would not recover neurologic function—that her brain was so severely damaged that no significant recovery was possible. Dr. Camp denies that he told the family that Mrs. Law was brain dead and claims that he told them that brain death is not a necessary factor in determining whether to continue life support measures. Dr. Hollister and Dr. Camp both maintain that they asked her family if she had a living will or whether they knew what her wishes would be, and her family indicated that she would not wish to remain in that condition. Law contends that Dr. Camp told the family that Mrs. Law was brain dead and that the decision to place Mrs. Law on patient-assisted ventilation was based on the family's belief that she was brain dead.

It is, however, an undisputed fact that during the meeting it was decided that Mrs. Law would be removed from the mechanical ventilator and placed on patient-assisted ventilation, by which the machine would breathe for her if she made any attempt to breathe on her own. Thus, if Mrs. Law had no brain function, she would not breathe and would die. Her family was aware that without brain function, Mrs. Law would expire.

At 5:52 p.m. Mrs. Law was removed from the mechanical ventilator. At 6:15 p.m. Mrs. Law died. She was pronounced dead by Dr. Rosenberg, who was called in by the floor nurses to make the pronouncement.

Mrs. Law did not have a living will, health care proxy or other notation regarding her wishes as to life support, and she had never expressed her wishes on this issue to her family or her physicians.

In October, 1994, Corvino was President of the Hospital and Warwick was Chairman of the Board of Trustees. Neither of them were involved in the care and treatment of Mrs. Law, and neither had supervisory responsibility or control over Dr. Camp or Dr. Hollister. In addition, neither of them had responsibility for preparing protocols for determining brain death or establishing policies regarding communications with patients' families.

### DISCUSSION

Based on these facts and circumstances, Law filed two separate law suits: one alleging medical malpractice, the other alleging fraud. Law now moves for partial summary judgment in the malpractice action on his claims against the Hospital Defendants, Dr. Hollister and Dr. Camp. Dr. Hollister and Dr. Camp move for summary judgment on all claims against them in both the malpractice action and the fraud action. Dr. Walsh, Dr. Rosenberg, and the Hospital Defendants also move for summary judgment in the malpractice action.

I. *Law's Motion For Partial Summary Judgment*

Law maintains that he is entitled to summary judgment in the medical malpractice action against the Hospital Defendants, Dr. Hollister and Dr. Camp on the grounds that these defendants violated the provisions of the Connecticut statute pertaining to the continuation or removal of life support systems, Conn.Gen.Stat. § 19a–540a,[1] and failed to follow the Hos-

---

1. Conn.Gen.Stat. § 19a–504a, "Continuation or removal of life support system. Determination of death," provides:

(a) For the purpose of this section, "life support system" means any mechanical or electronic device utilized by any medical

**302**

pital's brain death protocol.[2] He maintains that the defendants' failure to follow the provisions of the statute and Hospital protocol constitutes negligence per se. Specifically, Law asserts that § 19a–504a establishes a common law duty that prevents removal of life support from a person who has not been determined brain dead according to its procedures, that the Hospital protocol sets forth the only accepted medical standard for determining brain death of patients in the Hospital, and that the defendants breached this duty by removing Mrs. Law's life support without such a determination of death. He further

contends that there is no factual dispute as to causation because the removal of life support was the undisputed cause of Mrs. Law's death. Law also asserts that Conn. Gen.Stat. § 19a–571 (the "Removal of Life Support Systems Act"),[3] is not applicable as a defense in this case because Mrs. Law did not have a living will, health care proxy or other advance directive.

In opposition, Dr. Hollister maintains that Law's motion must fail because there is no expert testimony that § 19a–504a establishes the sole standard of care applicable to the removal of life support systems, or that under the applicable stan-

facility in order to replace, assist or supplement the function of any human vital organ or combination of organs.

(b) For purposes of making a determination concerning the continuation or removal of any life support system in a general hospital licensed under section 19a–491, an individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. Determination of death shall be made in accordance with accepted medical standards.

2. The Hospital's determination of brain death protocol provides, in pertinent part: "1. The attending physician will assume responsibility for sharing with the family the matter of apparent brain death, when in his/her clinical judgment the patient has no possibility of recovery ... 2. If the family verbally agrees to accept the attending physician's judgment of apparent brain death, it will be explained that two physicians each of which must be a neurosurgeon or neurologist, must be called in to establish the diagnosis of brain death and to record their opinion in the medical record ... c. 1. The attending physician will document on the patient's record appropriate discussion with the family and their compliance with the attending physician's clinical judgment...."

3. Conn.Gen.Stat. § 19a–571, "Liability re removal of life support system of incapacitated patient. Consideration of wishes of patient" provides, in relevant part:

(a) Subject to the provisions of subsection (c) of this section, any physician licensed under chapter 370 or any licensed medical facility who or which withholds, removes or causes the removal of a life support system of an incapacitated patient shall not be liable for damages in any civil action or subject to prosecution in any criminal pro-

ceeding for such withholding or removal provided, (1) the decision to withhold or remove such life support system is based on the best medical judgment of the attending physician in accordance with the usual and customary standards of medical practice, (2) the attending physician deems the patient to be in a terminal condition or, in consultation with a physician qualified to make a neurological diagnosis, who has examined the patient, deems the patient to be permanently unconscious; and (3) the attending physician has considered the patient's wishes concerning the withholding or withdrawal of life support systems. In the determination of the wishes of the patient, the attending physician shall consider the wishes as expressed by a document executed in accordance with sections 19a–575 and 19a–575a, if any such document is present to, or in the possession of, the attending physician at the time the decision to withhold or terminate a life support system is made. If the wishes of the patient have not been expressed in a living will the attending physician shall determine the wishes of the patient by consulting any statement made by the patient directly to the attending physician and, if available, the patient's health care agent, the patient's next of kin, the patient's legal guardian or conservator, if any, and any other person to whom the patient has communicated his wishes, if the attending physician has knowledge of such person ...

(b) A physician qualified to make a neurological diagnosis who is consulted by the attending physician pursuant to subdivision (2) of subsection (a) of this section shall not be liable for damages or subject to criminal prosecution for any determination made in accordance with the usual and customary standards of medical practice.

dard of care a determination of brain death was required before removing life support. Dr. Hollister offers expert testimony stating that determination of brain death is not necessary prior to placing a patient in Mrs. Law's condition on patient-assisted ventilation. In addition, his expert also states that Dr. Hollister "did not violate the standard of care with regard to the placement of Mrs. Law on patient-assisted ventilation." Dr. Hollister also contends that Law's summary judgment motion must be denied because he has not offered any expert opinion as to causation, and that such expert testimony is required in a medical malpractice case.

Dr. Camp makes the same arguments as those made by Dr. Hollister—that expert testimony is required in a medical malpractice action to establish the applicable standard of care, a breach of the standard of care and proximate cause. He asserts that Law has not only failed to offer expert testimony to establish these elements, but that Law's own expert witness, Dr. Vishnubhakat, testified that in light of Mrs. Law's condition, she would not have survived the cardiorespiratory arrest she suffered prior to being placed on the mechanical ventilator.

Both Dr. Camp and Dr. Hollister maintain that the Hospital's protocol for determining brain death was not applicable in Mrs. Law's case and that they were not required to, and did not follow its provisions.

The Hospital Defendants maintain that Law's negligence per se claim against them is both factually and legally untenable because they had no involvement in, nor any legal duty with regard to the removal of life support from Mrs. Law. Corvino and Warwick also maintain that they did not have supervisory responsibility or control of either Dr. Camp or Dr. Hollister, and that neither of them had any involvement in preparing the Hospital protocol. These two defendants further maintain that Connecticut law does not impose personal liability on a corporate officer merely because of his official position in the corporation. Finally, all the Hospital Defendants assert that Law's summary judgment motion is fatally defective because of the absence of the required expert testimony establishing the standard of care, its breach and proximate cause, which is required in medical malpractice actions against hospitals and hospital administrators just as it is required in actions against physicians.

### A. *Law's Claim of Negligence Per Se*

Negligence per se operates to engraft a particular legislative standard onto the general standard of care imposed by traditional tort law principles, i.e., the standard of care of an ordinarily prudent person. To find negligence in a negligence per se case the jury does not have to decide whether the defendant acted as an ordinary prudent person would have acted under the circumstances. It merely determines whether the statute was violated. If it was, then the defendant was negligent as a matter of law. *See Gore v. People's Sav. Bank*, 235 Conn. 360, 376, 665 A.2d 1341 (1995).

There are two necessary elements to a claim of negligence per se. First, the plaintiff must be in the class of persons for whose benefit the statute was enacted. Second, the plaintiff must prove that the violation of the statute, that is, the breach of duty imposed by the statute, was a proximate cause of the injury. *See Rivera v. Fairbank Management Prop., Inc.*, 45 Conn. 154, 45 Conn.Supp. 154, 703 A.2d 808 (1997). In determining the first element, the inquiry is whether the defendants were guilty of a breach of duty in failing to provide safeguards to prevent the injuries suffered by the plaintiff. *See Hassett v. Palmer*, 126 Conn. 468, 12 A.2d 646 (1940).

Contrary to Law's argument, there is nothing to support his claim that § 19a–504a establishes a legislative standard of care that in all instances governs the medical determination of brain death

or a duty of care regarding the removal of life support systems. Indeed, the statute clearly states that "[d]etermination of death shall be made in accordance with accepted medical standards." Conn.Gen. Stat. § 19a–504a. As the Connecticut Supreme Court noted, § 19a–504a reflects the legislature's recognition of the need for a uniform statutory definition by which a hospital may determine brain death to account for the recent advances in medical technology. *See State v. Guess,* 244 Conn. 761, 777, 715 A.2d 643 (1998). The court further noted that the statute expressly provides that the manner of determining death is to be controlled by reasonable medical standards. *See id.*[4] Moreover, there is nothing in the language of the statute, its legislative history or case law indicating that § 19a–504a was enacted to establish the standard of care for determining brain death. To the contrary, there is every indication that the statute was passed in 1984 to close the gap between modern medical technology, which made possible the artificial prolongation of human life, and the common law definition of death, which required cessation of heart and lung function. Because advances in medical technology made it possible for these bodily functions to continue in the absence of any brain function, a person on a mechanical ventilator would not be legally dead under the common law definition of death. *See Severns v. Wilmington Med. Center,* 421 A.2d 1334, 1344 (Del. 1980) (noting the penumbra created by medical miracles that compel us "to distinguish between death as we have known it, and death in which the body lives in some fashion but the brain . . . does not").

Thus, in response to the ethical, medical and legal dilemma which faced physicians and families in situations where the lives of patients with no hope of recovery could be artificially prolonged because they were not legally dead, legislatures were called on to enact statutes making brain death criteria an alternative legal definition of death. Their efforts resulted in the enactment in Connecticut of § 19a–504a, and, in the majority of other states, in the adoption of the Uniform Definition of Death Act, 12 U.L.A. 270 (1978), which contains language identical to the Connecticut act. *See* 27 S.Proc., Pt. 3, 1984 Sess., p. 1081–1082 (remarks of Senator Howard T. Owens, Jr.). There is absolutely no indication that these acts were intended to require a diagnosis of brain death as a condition precedent to cessation of life support. *See Barber v. Superior Court,* 147 Cal.App.3d 1006, 1014, 195 Cal.Rptr. 484 (1983).

■ There is also no legal authority to support Law's claim that the Hospital protocol is the only accepted medical standard for determining brain death. Indeed, the Connecticut Supreme Court has held that hospital rules and regulations do not establish the standard of care. *See Van Steensburg v. Lawrence & Mem. Hosps.,* 194 Conn. 500, 506, 481 A.2d 750 (1984).

Here, however, the court does not need to determine if § 19a–504a was intended to supplant the traditional and long-standing requirement of establishing the acceptable standard of care and a breach thereof by expert testimony. This is so because Law has not established proximate cause—the nexus between the negligence and Mrs. Law's death—by expert testimony. *See e.g., Buckley v. Lovallo,* 2 Conn.App. 579, 582–83, 481 A.2d 1286 (1984). His failure to do so is dispositive.

4. There is also nothing to support negligence per se under Conn.Gen.Stat. § 19a–571. The only logical construction of this statute is that it was enacted to implement a terminal patient's common law rights to self determination and privacy, *see McConnell v. Beverly Enterprises–Conn., Inc.,* 209 Conn. 692, 553 A.2d 596 (1989), and, by its express terms, to provide a safe harbor for physicians by insulating them from civil and criminal liability for discontinuing life support measures under certain specified circumstances. There is no merit to Law's contention that the court should apply the inferential maxim *"expressio unius est exclusio alterius"* which allows an inference that, where a statute identifies lawful behavior, by exclusion it identifies what is unlawful.

## B. *Proximate Cause*

It is axiomatic that the plaintiff in a medical malpractice action has the burden of proving legal causation by expert testimony. *See e.g., Campbell v. Pommier,* 5 Conn.App. 29, 32, 496 A.2d 975 (1985) ("In Connecticut, both breach of the standard of care and proximate cause must be proved by expert testimony"). No matter how negligent a party may be, if his act does not bear a legal, causal relation to the alleged injury, it is not actionable. *See Esposito v. Schiff,* 38 Conn.App. 726, 730, 662 A.2d 1337 (1995). Even under the doctrine of negligence per se, the plaintiff must prove that the statutory violation was the legal cause of the claimed injury. *See Zuchowicz v. United States,* 140 F.3d 381, 389 (2d Cir.1998); *see also Shelnitz v. Greenberg,* 200 Conn. 58, 509 A.2d 1023 (1986); *Aspiazu v. Orgera,* 205 Conn. 623, 535 A.2d 338 (1987). Proximate cause does not exist merely because there is "but for" cause or cause in fact. *See Stewart v. Federated Dept. Stores, Inc.,* 234 Conn. 597, 605–06, 662 A.2d 753 (1995).

In order for legal causation to exist, there must be both actual cause and proximate cause. *See Shegog v. Zabrecky,* 36 Conn.App. 737, 745, 654 A.2d 771 (1995). Actual cause requires evidence that the injury would not have occurred in the precise way it did without the defendant's conduct. *See id.* Proximate cause is defined as actual cause that is a substantial factor in the resulting harm. *See id.* (citing *Doe v. Manheimer,* 212 Conn. 748, 757, 563 A.2d 699 (1989)). "The meaning of the term 'substantial factor' is so clear as to need no expository definition.... Indeed, it is doubtful if the expression is susceptible of definition more understandable than the simple and familiar words it employs." *Mather v. Griffin Hosp.,* 207 Conn. 125, 130, 540 A.2d 666 (1988) (quoting *Pilon v. Alderman,* 112 Conn. 300, 301, 152 A. 157 (1930)).

To establish proximate cause in a medical malpractice action, the plaintiff must adduce evidence to a reasonable degree of medical probability that it is more likely than not that the injury claimed to have resulted from the alleged negligence was a substantial factor in causing the injury, and that without the alleged negligence, the injury would not have occurred. *See Borkowski v. Sacheti,* 43 Conn.App. 294, 301, 682 A.2d 1095 (1996). Where a preexisting condition is involved, the plaintiff must prove that the victim of the alleged negligence more likely than not would have survived if there had been no negligence. *See id.* at 302, 209–10, 682 A.2d 1095 (acknowledging that Connecticut recognizes the traditional approach to the lost chance doctrine in medical malpractice actions). Thus, if the victim probably would not have survived, the proximate cause of death would be the preexisting condition, not the defendant's alleged negligence. *See id.* There are numerous cases in which removal of life support was found, as a matter of law, to not constitute probable cause of death where there was a preexisting condition. *See State v. Guess,* 44 Conn.App. 790, 800, 692 A.2d 849 (1997); *see also McConnell v. Beverly Enterprises–Connecticut, Inc.,* 209 Conn. 692, 553 A.2d 596 (1989) (agreeing with the majority of jurisdictions that have addressed the issue and holding that the removal of life support is not the "death producing agent").

Expert medical opinion is generally required in all medical malpractice cases to establish the proximate cause of an injury "because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." *Shegog v. Zabrecky,* 36 Conn.App. at 745–46, 654 A.2d 771 (citing *Aspiazu v. Orgera,* 205 Conn. 623, 631, 535 A.2d 338 (1987)); *Grody v. Tulin,* 170 Conn. 443, 449, 365 A.2d 1076 (1976). A narrow exception to the general rule requiring expert opinion to establish proximate cause in a medical malpractice case exists where the plaintiff's evidence creates a probability so strong that a lay jury can form a reasonable belief without it, *see Esposito v.*

*Schiff,* 38 Conn.App. at 730, 662 A.2d 1337, or where the physician's negligence is so gross as to afford an almost conclusive inference of causation, *see Puro v. Henry,* 188 Conn. 301, 305, 449 A.2d 176 (1982).

Here, Law offers no expert opinion to establish that the defendants' alleged negligence was a proximate cause of Mrs. Law's death. He merely asserts that causation is not an issue because it is undisputed that Mrs. Law was not brain dead before the life support was removed and that she died as a result of its removal. Law's failure to adduce the required expert opinion as to causation is fatal to his claim. *See e.g., Stowe v. McHugh,* 46 Conn.App. 391, 699 A.2d 279 (1997) (noting that summary judgment is appropriate where plaintiff lacks expert testimony to establish probable cause in a medical malpractice action); *Vinchiarello v. Kathuria,* 18 Conn.App. 377, 381, 558 A.2d 262 (1989) (affirming directed verdict where plaintiff did not present any evidence that the defendant's negligence was the proximate cause of death).

This is not one of the rare cases where causation is within the ken of a lay person. To the contrary, whether Mrs. Law could have survived the severe anoxic ischemic insult and the cardiorespiratory arrest is far from the sphere of a lay person's common knowledge. In any event, Law's own medical expert, Dr. Vishnubhakat, states that Mrs. Law "absolutely" could not have survived the initial cardiorespiratory arrest she suffered before she was put on the mechanical ventilator. Moreover, the defendants have submitted expert testimony stating that their alleged negligent acts were not the proximate cause of Mrs. Law's death.

Accordingly, because Law has no expert testimony to establish that the proximate cause of Mrs. Law's death was the removal

of life support, and because the expert opinions of both his expert and the defendants' expert establish that she would not have survived the cardiorespiratory arrest she suffered before being placed on the mechanical ventilator, Law's motion for summary judgment must be denied.

## II. *Defendants' Motions For Summary Judgment*

Dr. Walsh, Dr. Rosenberg and the Hospital Defendants move for summary judgment in the medical malpractice action. Dr. Hollister and Dr. Camp move for summary judgment in both the malpractice and fraud actions.

### A. *Dr. Walsh's Motion*

Law's claims against Dr. Walsh are that he failed to properly diagnose the severity of Mrs. Law's infection and was negligent in leaving her in the care of an unqualified and inexperienced intern. He alleges that Dr. Walsh's negligence caused Mrs. Law to suffer respiratory arrest, cardiac arrest and a comatose state.

Dr. Walsh maintains that summary judgment must be granted in his favor because Law has not provided expert testimony concerning the applicable standard of care and his deviation therefrom, and also has not produced a doctor qualified to provide expert testimony pursuant to Conn.Gen.Stat. § 52–184.

In opposition, Law submits a report of Jay B. Krasner, M.D. ("Dr.Krasner"), which he offers as a "rebuttal" witness. He maintains that Dr. Krasner's testimony demonstrates that there are material facts in dispute which preclude summary judgment. However, in prior rulings of this court Dr. Krasner's report and testimony have been precluded. Thus, his opinions and testimony can not be considered in opposition to any of the defendants' motions for summary judgment.[5] According-

---

5. On four separate occasions, the court has precluded the report and testimony of Dr. Krasner. Most recently, on June 15, 2000, the court ruled that "Plaintiff may not use Dr. Krasner's expert report or testimony in support of, or in opposition to, summary judg-

ment or at trial in plaintiff's case-in-chief." *Law v. Camp,* No. 3:96CV2147(AHN), Ruling on Defendants' Motion To Preclude Additional Expert Testimony, (D.Ct. June 2, 2000) (Doc. # 304).

ly, Law does not have any expert testimony to support his malpractice claims against Dr. Walsh. This lack of evidence is fatal to his claims.

■ As previously noted, under Connecticut law a plaintiff must establish through expert testimony: (1) the applicable standard of care, (2) the defendant's breach of that standard, and (3) that the breach proximately caused the injury. *See e.g., Pisel v. Stamford Hosp.*, 180 Conn. 314, 334–42, 430 A.2d 1 (1980). Summary judgment is appropriate where it is evident that the plaintiff cannot produce such expert testimony. *See Guzze v. New Britain Gen. Hosp.*, 16 Conn.App. 480, 484–85, 547 A.2d 944 (1988); *see also Stowe v. McHugh*, 46 Conn.App. 391, 699 A.2d 279 (1997).

Here, Law has two expert witnesses: Dr. Kaufman and Dr. Vishnubhakat. Dr. Kaufman is a hospital administrator. He has no opinion regarding the care given to Mrs. Law by Dr. Walsh. Similarly, Dr. Vishnubhakat also has no opinion as to whether Dr. Walsh deviated from the standard of care. Moreover, neither of these expert witnesses are experienced or board certified in Dr. Walsh's specialty, internal medicine. *See* Conn.Gen.Stat. § 52–184c (requiring expert witnesses to be similar healthcare providers).

Thus, Law has no evidence to support his malpractice claim against Dr. Walsh. Moreover, as previously noted, this is not a case where the alleged negligence is so great that it permits an inference of negligence without such evidence. Accordingly, Dr. Walsh's motion for summary judgment is granted.

B.  *Dr. Hollister's & Dr. Camp's Motions*

■ Law alleges in counts three, five and seven of the malpractice action that Dr. Hollister was negligent in failing to properly diagnose and treat Mrs. Law and in leaving her in the care of an inexperienced and unqualified intern. He also asserts a claim against Dr. Hollister for failing to keep Mrs. Law's family informed of her condition, count six, and in count fourteen, that he violated Conn.Gen.Stat. § 19a–571 by failing to continue life support. Law alleges in count eleven of the malpractice complaint that Dr. Camp erroneously diagnosed Mrs. Law as brain dead and that this led to the removal of life support, which caused her death.

Dr. Hollister and Dr. Camp make the same arguments as those made by Dr. Walsh: that Law's failure to adduce expert testimony as to the standard of care, breach and proximate cause is fatal to a claim of medical malpractice. Thus, for the same reasons Dr. Walsh's motion should be granted, Dr. Hollister's and Dr. Camp's motions for summary judgment on counts three, five, seven and eleven should also be granted.[6]

■ With regard to counts six and fourteen in the malpractice action against Dr. Hollister, the absence of expert evidence establishing that his alleged failure to keep Mrs. Law's family informed and his failure to continue life support proximately caused her death, is also dispositive.

As previously discussed, expert opinion is generally required in all medical malpractice actions to establish that the alleged negligence was a proximate cause of the injury. *See e.g., Shegog v. Zabrecky*, 36 Conn.App. 737, 745–46, 654 A.2d 771 (1995). Here, Law has absolutely no evidence that Dr. Hollister's alleged failure to keep Mrs. Law's family informed of her condition was a substantial factor in causing her death. He also has no competent

---

**6.** Dr. Hollister and Dr. Camp also maintain that summary judgment must be granted on Law's claims in his individual capacity because he has not alleged a cognizable injury. Dr. Hollister also moves for summary judgment on count fourteen on the alternative theory that Conn.Gen.Stat. § 19a–571 does not create a private cause of action. Because summary judgment is appropriate for Law's failure to adduce expert testimony, the court need not address these alternative arguments.

evidence that Mrs. Law more likely than not would have survived if the life support system had not been discontinued. Because evidence of probable cause is lacking, Law can not prevail on his claims against Dr. Hollister in counts six and fourteen. *See Wei Ping Wu v. Town of Fairfield,* 204 Conn. 435, 441, 528 A.2d 364 (1987).

Dr. Hollister and Dr. Camp are also entitled to summary judgment in the fraud action because Law has no evidence that Mrs. Law was not brain dead when life support was removed and that its removal was the proximate cause of Mrs. Law's death.[7]

Law's expert, Dr. Vishnubhakat, testified that he could not state to a reasonable degree of medical certainty that Mrs. Law was not brain dead before life support was removed. Thus, there is no evidence to support two of the required elements of a fraud claim: that the alleged statement was false, and that the fraud was the proximate cause of damages.

The necessary elements of a cause of action in fraud are: (1) that a false representation was made as a statement of fact; (2) that the statement was untrue and known to be untrue by the party making it; (3) that the statement was made to induce the other party to act on it; and (4) the other party relied on the statement to his detriment. *See Rizzo Pool Co. v. Del Grosso,* 232 Conn. 666, 683, 657 A.2d 1087 (1995). The plaintiff has the burden of proving all of these elements of fraud by clear, precise and unequivocal evidence. *See Bound Brook Ass'n v. City of Norwalk,* 198 Conn. 660, 666, 504 A.2d 1047 (1986).

In addition, in order to recover for fraudulent misrepresentation, a plaintiff must allege injury that is the direct and proximate result of the alleged mis-

representation. *See Chanoff v. U.S. Surgical Corp.,* 857 F.Supp. 1011, 1017 (D.Conn.1994). "The damages to be recovered ... [must be] the natural and proximate consequence of the fraudulent representation complained of...." *Kilduff v. Adams, Inc.,* 219 Conn. 314, 323–24, 593 A.2d 478 (1991). Damages resulting from fraudulent misrepresentations need only be proved by a preponderance of the evidence. *See id.* at 330, 593 A.2d 478.

As previously discussed, proximate cause is more than "but for" causation. "[I]n addition to showing that but for defendant's alleged misrepresentations plaintiff would not have suffered his asserted damages, plaintiffs must also show that the misstatements were the reason plaintiff suffered these damages." *Johnson v. Chesebrough–Ponds USA Co.,* 918 F.Supp. 543, 548 (D.Conn.1996). When factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, the same injury can not be said to have occurred as a reason of the defendant's actions. *See id.* (quoting *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994)).

Here, factors other than the doctors' alleged fraud were the intervening direct and proximate cause of the injury. Thus, even if Law can prove "but for" the misrepresentation, the alleged injury would not have occurred, there is no evidence that the alleged misrepresentation was the proximate cause of Mrs. Law's death and Law's emotional distress. To the contrary, the court has previously found that there is no evidence that the alleged injury would not have occurred if life support had not been discontinued. Thus, even if Dr. Camp and Dr. Hollister intentionally misinformed Law that Mrs. Law was brain dead, summary judgment on Law's fraud claim is appropriate because he has no

7. Law submits Mrs. Law's death certificate, which states that she was pronounced dead at 6:15 p.m. is evidence that she was not dead when the doctors told her family that she was. Even if this was sufficient to create a triable issue of fact as to whether Mrs. Law was not dead when the doctors told her family that she was, the claim is still untenable because Law can not establish that the alleged misrepresentation was the proximate cause of her death.

evidence that the misrepresentation was the proximate cause.

### C. *Dr. Rosenberg's Motion*

■ In count thirteen of the malpractice action, Law alleges that Dr. Rosenberg "failed to reverse the termination of life support procedures when he knew or should have known that [Mrs. Law] was not brain dead." The undisputed facts supporting this allegation are that Dr. Rosenberg was called to Mrs. Law's bedside by the nurses to pronounce her dead at 6:15 p.m.

Dr. Rosenberg moves for summary judgment on the grounds that Law has no expert testimony to prove that he breached the applicable standard of care and that the breach was a proximate cause of Mrs. Law's death. He contends that he was not involved in the decision to remove life support and did not see Mrs. Law prior to her death.

In opposition, Law maintains that there is a genuine factual dispute as to whether Dr. Rosenberg saw Mrs. Law alive and that this factual dispute precludes summary judgment. Law relies on Mrs. Law's death certificate, in which Dr. Rosenberg certifies: "I last attended the deceased from Oct. 26 94 to Oct. 28 94, and last saw him/her alive on Oct. 28 94." Law maintains that this evidence supports his claim that Dr. Rosenberg was Mrs. Law's attending physician and was involved in Mrs. Law's care, and that he could have prevented or reversed the removal of life support.

However, even if the death certificate creates a factual dispute as to Dr. Rosenberg's involvement in Mrs. Law's care and the removal of life support, it is not a material one that precludes summary judgment. This is because, as previously discussed, Law has no evidence that Dr. Rosenberg's actions or inactions were the proximate cause of Mrs. Law's death. Accordingly, summary judgment in Dr. Rosenberg's favor is warranted.

### D. *The Hospital Defendants' Motion*

■ The claims against the Hospital Defendants are contained in counts two, four, five, six, seven, nine and twelve. Specifically, Law alleges that the emergency room personnel who evaluated Mrs. Law failed to diagnose the severity of her condition, that Dr. Brunetti, a Hospital intern, failed to understand, diagnose and treat Mrs. Law's condition and failed to inform or misinformed other physicians and Hospital personnel of his actions or lack of actions during the early morning hours of October 27, 1994, that the Hospital, Corvino and Warwick were negligent in leaving the care and treatment of Mrs. Law to an unqualified and inexperienced intern who was unable to evaluate and treat her condition, that the Hospital Defendants failed to inform Mrs. Law's family of the nature and cause of her condition, that Dr. Lee and Dr. Kline, also Hospital residents, failed to diagnose Mrs. Law's infection and septic shock and failed to properly treat this condition, that the Hospital, Corvino and Warwick failed to have proper, qualified personnel on duty and failed to record all information which caused delay in providing proper treatment for Mrs. Law, and that Warwick and Corvino failed to have a proper and failsafe protocol for determining brain death.

The Hospital Defendants maintain that summary judgment should be granted because Law has no expert testimony to establish the standard of care, breach and proximate cause and that expert testimony is required in malpractice actions against a hospital just as it is required in other malpractice cases. *See Logan v. Greenwich Hosp. Ass'n,* 191 Conn. 282, 304, 465 A.2d 294 (1983); *Buckley v. Lovallo,* 2 Conn.App. 579, 582–83, 481 A.2d 1286 (1984). They maintain that neither the testimony of Dr. Kaufman, Law's hospital administration expert, nor Dr. Vishnubhakat, his neurological expert, is sufficient to establish liability. In particular, they assert that Dr. Kaufman stated at his deposition that he had no opinion as to the

negligence of Dr. Brunetti, Dr. Lee, and Dr. Kline and that his opinion only dealt with the Hospital, not the individual doctors. In addition, the Hospital Defendants point out that Dr. Vishnubhakat also had no opinion as to whether they complied with the applicable standard of care or whether there was a causal nexus between their acts and Mrs. Law's death. The Hospital further asserts that Dr. Kaufman, even though his opinion deals with the standard of care for hospitals, has no opinion as to whether the Hospital's administrative negligence caused the alleged harm.

Dr. Kaufman's report states that the Hospital and its agents and employees failed in their duty to Mrs. Law and that their failure bore a direct relationship to her death. Specifically, he asserts that Dr. Walsh breached his duty to Mrs. Law when he left the hospital and placed her care in Dr. Hollister's hands without directly communicating with him. It is his opinion that this breach caused Mrs. Law to receive a lesser level of care from the hospital staff as opposed to care from an attending physician. In his opinion the inexperienced care by residents resulted in the patient not being managed in the ICU, and in not having an infectious disease specialist called in a timely manner. Dr. Kaufman further states that the nurses who observed Mrs. Law failed to appreciate her progressive deterioration and consequently did not call the attending physician in a timely manner. He concludes that their failures compounded those of the house staff and were directly and proximately related to the patient's demise.

Notwithstanding these assertions in his written report, Dr. Kaufman testified that he was not prepared to render an opinion as to how the Hospital's deviation from the standard of care resulted in any change in the patient's outcome other than "it didn't do her any good." He also stated that causation was a clinical issue and that because he was not a clinician, he was not offering any opinion on clinical issues. Thus, because Law's expert witnesses do not have any opinion as to whether the Hospital's negligence caused Mrs. Law's death, Law's claims against the Hospital must also fail.

■ Warwick and Corvino also maintain that their motion for summary judgment must be granted as a matter of law because they were not personally involved in the care and treatment of Mrs. Law. They also contend that they can not be held personally liable under a theory of corporate negligence merely because of their positions as officers and directors of the Hospital. *See DeSantis v. Piccadilly Land Corp.,* 3 Conn.App. 310, 316, 487 A.2d 1110 (1985); *Campisano v. Nardi,* 212 Conn. 282, 288, 562 A.2d 1 (1989). The court agrees.

■ Under the doctrine of corporate negligence, liability is imposed where a corporation's officers and directors, as opposed to ordinary employees, fail to maintain the standard of care required of the particular corporation. *See Buckley v. Lovallo,* 2 Conn.App. at 582, 481 A.2d 1286. Expert testimony is, however, required to sustain such a claim against a hospital. Neither Dr. Kaufman nor Dr. Vishnubhakat had an opinion as to the negligence of Warwick and Corvino.

■ Finally, there is no merit to Law's claims regarding the Hospital's failure to establish or insure that its brain death protocol was followed. Not only does Law fail to offer any evidence that this was the proximate cause of Mrs. Law's death, it is well settled that a "hospital's rules, regulations and policies do not themselves establish the standard of care." *Van Steensburg v. Lawrence and Mem. Hosp.,* 194 Conn. 500, 506, 481 A.2d 750 (1984). While the failure to follow such rules or policies may be evidence of negligence, *see id.,* expert testimony that the negligence was the proximate cause of the alleged injury is required for liability. *See Petriello v. Kalman,* 215 Conn. 377, 382, 576 A.2d 474 (1990). Thus, merely because there is a hospital policy, the hospital is not legally obligated to guarantee

that the policy is followed. *See id.* at 386, 576 A.2d 474.

## CONCLUSION

For the foregoing reasons, Law's motion for partial summary judgment in the malpractice action [doc. # 196] is DENIED. The Hospital Defendants' motion for summary judgment in the malpractice action [doc. # 227] is GRANTED. Dr. Camp's motion for summary judgment in both actions [doc. # 267] is GRANTED. Dr. Hollister's motion for summary judgment in both actions [doc. # 243] is GRANTED. Dr. Walsh's motion for summary judgment in the malpractice action [doc. # 262] is GRANTED. Dr. Rosenberg's motion for summary judgment in the malpractice action [doc. # 259] is also GRANTED. The Clerk is directed to close these cases.